180 P.3d 1257 (2008)
Charles R. McNABB, Petitioner
v.
DEPARTMENT OF CORRECTIONS, an agency of the state of Washington; Joseph D. Lehman, secretary of Department of Corrections, in his official capacity, Respondents.
No. 77359-9.
Supreme Court of Washington, En Banc.
Argued May 11, 2006.
Decided April 10, 2008.
*1259 Terri D. Sloyer, Attorney at Law, Breean Lawrence Beggs, Center for Justice, Spokane, WA, for Petitioner.
Mary Catherine McLachlan, Attorney Generals Office WA., Spokane, WA, Carol A. Murphy, Attorney General's Office, Olympia, WA, for Respondent.
FAIRHURST, J.
¶ 1 Charles R. McNabb seeks review of a published Court of Appeals decision affirming summary judgment in favor of the Department of Corrections (DOC). McNabb sued DOC and Joseph D. Lehman, secretary of DOC, in his official capacity (hereinafter collectively DOC), seeking to have DOC's force-feeding policy declared unconstitutional, illegal, and invalid as applied to him and to enjoin DOC from enforcing the policy. McNabb argues that he has a right to refuse artificial means of nutrition and hydration arising independently from the explicit privacy guaranty in article I, section 7 of the Washington Constitution[1] and from his common law right to refuse medical treatment. He also argues the State may infringe that right only if it has a narrowly drawn compelling interest.
¶ 2 We conclude that an independent state constitutional analysis of the right to refuse artificial means of nutrition and hydration is warranted under article I, section 7. We also conclude that the State's interests in applying DOC's force-feeding policy to McNabb outweigh his right to refuse artificial means of nutrition and hydration. We affirm the Court of Appeals.

I. PROCEDURAL HISTORY
¶ 3 McNabb arrived at Airway Heights Corrections Center (AHCC) from the Spokane County Jail in July 2004, at which time he had not eaten voluntarily for over five months.[2] AHCC staff began to force-feed McNabb by nasogastric tube one or two days after he arrived because he refused food and drink. After DOC force-fed him for several days, McNabb agreed to eat on his own.[3] He has not been force-fed since.
¶ 4 McNabb filed suit in Spokane County Superior Court shortly after he began to eat on his own. He claimed that DOC's force-feeding policy violated his right to privacy under article I, section 7 and his common law right to be free of bodily invasion. He sought a declaratory judgment, preliminary injunction, consolidation of hearing on the merits, and summary judgment. DOC objected, arguing that McNabb was no longer being force-fed and that there had not been sufficient opportunity for discovery. At the hearing, the trial court concluded that the case involved only questions of law, found that McNabb did not have a right to refuse artificial means of nutrition and hydration while in state custody, and entered an order sua sponte granting summary judgment in favor of DOC.
¶ 5 McNabb appealed the trial court order to Division Three of the Court of Appeals, arguing that he has a fundamental constitutional right to refuse artificial means of nutrition and hydration arising under article I, section 7 and a common law right to determine *1260 what is done with his body. The Court of Appeals concluded that Washington precedent prohibiting "unconsented invasions of the body" does not support McNabb's claim that an inmate has a constitutional right to refuse artificial means of nutrition and hydration. McNabb v. Dep't of Corrs., 127 Wash.App. 854, 858, 112 P.3d 592 (2005). It concluded there was no Washington case law suggesting that article I, section 7 provides greater protection to prison inmates than the federal constitution. Id. at 859, 112 P.3d 592. The court also concluded that the privacy right McNabb has to refuse artificial means of nutrition and hydration is not absolute and the court must balance the right against the State's interests in protecting life, preventing suicide, and preserving the internal order and discipline of the prison system. Id. at 859-60, 112 P.3d 592. It held that although DOC's force-feeding policy might violate McNabb's privacy right to refuse artificial means of nutrition and hydration, the State's interests outweigh his right. Id. at 861, 112 P.3d 592.
¶ 6 McNabb petitioned this court to determine whether he has a right to refuse artificial means of nutrition and hydration that arises independently from the privacy guaranty in article I, section 7 and whether the State can infringe on that right only if it has a narrowly drawn compelling interest. We granted review. McNabb v. Dep't of Corrs., 156 Wash.2d 1016, 132 P.3d 734 (2006).

II. ISSUES
A. Should the court analyze the right to refuse artificial means of nutrition and hydration under article I, section 7 on independent state constitutional grounds?
B. Does article I, section 7 guarantee an otherwise healthy and competent inmate' the absolute right to refuse artificial means of nutrition and hydration after he or she has engaged in a prolonged fast with the intent to die as a result?
C. Do the State's interests outweigh McNabb's right to refuse artificial means of nutrition and hydration?

III. STANDARD OF REVIEW
¶ 7 We normally review denial of an injunction for abuse of discretion. State v. Kelley, 77 Wash.App. 66, 69, 889 P.2d 940 (1995) (citing State ex rel. Carroll v. Junker, 79 Wash.2d 12, 26, 482 P.2d 775 (1971)). We review an order of summary judgment in a declaratory judgment action de novo and perform the same inquiry as the trial court. Simpson Tacoma Kraft Co. v. Dep't of Ecology, 119 Wash.2d 640, 646, 835 P.2d 1030 (1992). Facts and reasonable inferences are considered in the light most favorable to the nonmoving party and questions of law are reviewed de novo. Coppernoll v. Reed, 155 Wash.2d 290, 296, 119 P.3d 318 (2005).

IV. ANALYSIS
¶ 8 As a preliminary matter, we will define the terms used to describe the constitutional right at issue here. The dissent characterizes the right McNabb asserts as the right to bodily integrity. Dissent at 1270. McNabb describes his claim as the right of "bodily integrity" of which "the right to refuse artificial means of nutrition and hydration" is a subset. Pet. for Review at 4. Previously, we characterized the right to refuse nasogastric intubation as the right to refuse "artificial means of nutrition and hydration." In re Guardianship of Grant, 109 Wash.2d 545, 565, 747 P.2d 445, 757 P.2d 534 (1988). This right is subject to the same analysis used to examine the right to refuse life-sustaining medical treatment. Id. at 562, 747 P.2d 445. Consistent with the vernacular in Grant, we will refer to McNabb's asserted right as the right to refuse artificial means of nutrition and hydration.
¶ 9 McNabb claims that he has a right to refuse artificial means of nutrition and hydration but would have the court consider this issue in relative isolation of the circumstances that precipitated the involuntary nasogastric intubation. We think the events leading up to DOC applying its force-feeding policy bear significant import to the right being asserted. Prior to the medical intervention, McNabb fasted willfully for a period of five months. McNabb is not terminally ill or chronically debilitated by disease. However, he asks the court to allow him to refuse *1261 artificial means of nutrition and hydration so that his fast may "`take its course'" with the inevitable and intended consequence of death. Br. of Appellant at 2 (quoting Clerk's Papers (CP) at 7). Accordingly, this opinion discusses the right to refuse artificial means of nutrition and hydration in the context of an inmate whose intentional acts procured the circumstances giving rise to the condition necessitating nasogastric intubation.
A. Should the court analyze the right to refuse artificial means of nutrition and hydration under article I, section 7 on independent state constitutional grounds?
¶ 10 McNabb argues that it is well established that he has a right to refuse artificial means of nutrition and hydration arising independently from the explicit privacy guaranty of article I, section 7 that is "far stronger than any in federal law." Pet. for Review at 5. To support this proposition, he cites a line of cases[4] in which he claims this court has held that individuals may refuse medical treatment, including artificial nutrition and hydration. DOC counters that no Washington court has previously considered the specific question of whether a right to refuse artificial means of nutrition and hydration arises independently from the privacy guaranty of article I, section 7 and urges us to hold that it does not.
¶ 11 When a party claims a provision of the state constitution provides greater protection than a provision of the federal constitution, we conduct a two-step inquiry.
¶ 12 First, we determine whether an independent analysis of the state constitutional provision is warranted. As part of this inquiry, we ask whether it is settled law that an independent analysis should be conducted when interpreting the state constitutional provision. If so, we go to step two and proceed with our independent analysis. However, if it is not settled law that an independent analysis should be conducted  because we have not been asked or because we have historically followed federal precedent in interpreting a state constitutional provision  we will determine whether the state constitutional provision "should be given an interpretation independent from that given to the corresponding federal constitutional provision," but only if the parties brief the six nonexclusive factors set out in State v. Gunwall, 106 Wash.2d 54, 64, 720 P.2d 808 (1986). State v. McKinney, 148 Wash.2d 20, 26, 60 P.3d 46 (2002) (citing Gunwall, 106 Wash.2d at 64, 720 P.2d 808). The Gunwall factors include (1) the text of the state constitutional provision at issue, (2) textual differences between parallel state and federal constitutional provisions, (3) state constitutional and common law history, (4) preexisting state law, (5) structural differences between state and federal constitutions, and (6) whether the case involves matters of particular state or local concern. 106 Wash.2d at 61-62, 720 P.2d 808.
¶ 13 If we determine an independent analysis is warranted, we next determine, in the second step of our inquiry, "whether the provision in question extends greater protections for the citizens of this state." McKinney, 148 Wash.2d at 26, 60 P.3d 46. This second analysis focuses on whether our state constitution provides greater protection of the claimed right in the particular context than the federal constitutional provision, and the scope of that protection.
¶ 14 For step one, we conclude that it is unnecessary to engage in a Gunwall analysis where prior case law employing Gunwall establishes that a certain state constitutional provision has an "independent meaning" from the federal constitution. Id. It is well settled that the privacy protections provided by article I, section 7 of the Washington Constitution have an independent meaning from that provided by the federal constitution. Id. (citing City of Seattle v. McCready, 123 Wash.2d 260, 267, 868 P.2d 134 (1994)). We have also recognized that "[i]t is by now commonplace to observe Const. art. 1, § 7 *1262 provides protections for the citizens of Washington which are qualitatively different from, and in some cases broader than, those provided by the Fourth Amendment." McCready, 123 Wash.2d at 267, 868 P.2d 134. In accord with these cases, we conclude that it is unnecessary to engage in a Gunwall analysis to determine whether a claim under article I, section 7 warrants a constitutional analysis on independent state grounds.
¶ 15 At present, McNabb asserts his right to refuse artificial means of nutrition and hydration under article I, section 7 of the state constitution. Relying on our previous holdings, we conclude that an independent state constitutional analysis of the privacy protections contained in article I, section 7 is warranted. Next, we determine the second step of the inquiry, whether article I, section 7 extends greater protection than the federal constitution and the scope of that protection.
¶ 16 While Washington courts have recognized a competent individual's right to refuse artificial means of nutrition and hydration arising independently from article I, section 7 of the state constitution and from the common law informed consent doctrine, they have relied on the federal constitution for their analysis. Grant, 109 Wash.2d at 554, 747 P.2d 445. Federal courts have historically recognized a competent individual's right to refuse artificial nutrition and hydration under the specific guaranties in the First, Fourth, Fifth, Ninth, and Fourteenth Amendments. Cruzan v. Mo. Dep't of Health, 497 U.S. 261, 279, 110 S.Ct. 2841, 111 L.Ed.2d 224 (1990); In re Welfare of Colyer, 99 Wash.2d 114, 119-20, 660 P.2d 738 (1983). Federal courts have also recognized a competent individual's right to refuse "lifesustaining treatment" deriving from the common law right to be free from bodily invasion and the informed consent doctrine. Cruzan, 497 U.S. at 270, 110 S.Ct. 2841; Colyer, 99 Wash.2d at 121, 660 P.2d 738. Based on Washington courts' reliance on the federal constitution, we conclude the protection granted under article I, section 7 in this context is coextensive with, but not greater than, the protection granted under the federal constitution.
B. Does article I, section 7 guarantee an otherwise healthy and competent inmate the absolute right to refuse artificial means of nutrition and hydration after he or she has engaged in a prolonged fast with the intent to die as a result?
¶ 17 McNabb argues that he has an absolute right to refuse artificial means of nutrition and hydration under article I, section 7, even if refusal would result in his death. DOC responds that the right McNabb asserts does not exist. DOC argues that courts acknowledge the right to refuse artificial means of nutrition and hydration, but only when the individual is "in an advanced state of a terminal or incurable illness" or "suffering severe permanent mental or physical deterioration." DOC's Answer to Pet. for Review at 12. Because McNabb is neither, DOC argues that McNabb is asserting a right to commit suicide, something no court has ever recognized.
¶ 18 Washington courts have considered the right to refuse medical treatment, including artificial nutrition and hydration, only in the context of nonincarcerated individuals who suffer from a terminal or debilitating condition.[5] In most of those cases, the individual's right has been upheld.[6]Grant, 109 *1263 Wash.2d at 565, 747 P.2d 445 (granting a mother's request to authorize future withholding of life sustaining procedures from her daughter who was suffering from a terminal illness, noting that we did not endorse suicide or euthanasia and withholding of treatment would not be the cause of death); In re Guardianship of Ingram, 102 Wash.2d 827, 829, 689 P.2d 1363 (1984) (reversing a trial court order imposing surgery rather than an alternative treatment for a woman with multiple physical ailments and malignant cancer of the larynx who opposed surgery to correct the cancer); Colyer, 99 Wash.2d at 123, 660 P.2d 738 (concluding there were "no compelling state interests opposing the removal of life sustaining mechanisms from [a patient in a chronic vegetative state] that outweighed her right to refuse such treatment").
¶ 19 When analyzing the scope of the right to refuse artificial means of nutrition and hydration as applied to nonincarcerated individuals, Washington courts have determined that the individual's right to refuse artificial means of nutrition and hydration is not absolute and that narrowly drawn, compelling state interests may outweigh that right. In re Det. of Schuoler, 106 Wash.2d 500, 508, 723 P.2d 1103 (1986) (citing Roe v. Wade, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973)). Compelling state interests include "(1) the preservation of life; (2) the protection of interests of innocent third parties; (3) the prevention of suicide; and (4) maintenance of the ethical integrity of the medical profession." Colyer, 99 Wash.2d at 122, 660 P.2d 738; Ingram, 102 Wash.2d at 842, 689 P.2d 1363; Schuoler, 106 Wash.2d at 508, 723 P.2d 1103; Grant, 109 Wash.2d at 556, 747 P.2d 445.
¶ 20 The question of whether an incarcerated individual not suffering from a terminal or debilitating condition has a right to refuse artificial means of nutrition and hydration is an issue of first impression for this court, and, therefore, both parties have turned to other jurisdictions to support their claims.
¶ 21 Six courts in other jurisdictions have expressly recognized that competent individuals who are incarcerated have a right to refuse artificial means of nutrition and hydration but the right is not absolute and must be balanced against the state's interests. People ex rel. III. Dep't of Corrs. v. Millard, 335 Ill.App.3d 1066, 782 N.E.2d 966, 970, 270 Ill.Dec. 407 (2003); Singletary v. Costello, 665 So.2d 1099, 1104 (Fla.Dist.Ct. App.1996); Laurie v. Senecal, 666 A.2d 806, 808-09 (R.I.1995); State ex rel. Schuetzle v. Vogel, 537 N.W.2d 358, 360 (N.D.1995); In re Caulk, 125 N.H. 226, 480 A.2d 93, 95 (1984); State ex rel. White v. Narick, 170 W.Va. 195, 292 S.E.2d 54, 57-58 (1982).[7] All of these courts concluded that inmates' rights are more limited than those of nonincarcerated individuals because courts must consider the state's additional interests related to incarceration. Millard, 270 Ill.Dec. 407, 782 N.E.2d at 970; Singletary, 665 So.2d at 1104; Senecal, 666 A.2d at 808-09; Schuetzle, 537 N.W.2d at 360; Caulk, 480 A.2d at 95; White, 292 S.E.2d at 57-58.
¶ 22 In a similar vein, we have recognized that "`[t]here is no iron curtain drawn between the Constitution and the prisons of this country.'" State v. Hartzog, 96 Wash.2d 383, 391, 635 P.2d 694 (1981) (quoting Wolff v. McDonnell, 418 U.S. 539, 555-56, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974)). An individual retains a modicum of constitutional protection while incarcerated. However, "many rights and privileges are subject to limitation in penal institutions because of paramount institutional goals and policies." Id. (citing Bell v. Wolfish, 441 U.S. 520, 545-46, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979); *1264 Wolff, 418 U.S. at 555-56, 94 S.Ct. 2963; Rhodes v. Chapman, 452 U.S. 337, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981)). Therefore, in accord with holdings from other jurisdictions, we conclude that McNabb retains a limited right of privacy, including the limited right to refuse artificial means of nutrition and hydration[8] subject to the goals and policies of the prison system.
C. Do the State's interests outweigh McNabb's right to refuse artificial means of nutrition and hydration?
¶ 23 DOC argues that because this case involves an inmate, we should consider the state interests recognized by the United States Supreme Court in Turner v. Safley, 482 U.S. 78, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987).[9]Turner acknowledged that while inmates retain their fundamental constitutional rights, difficulties inherent in prison administration diminish an inmate's rights. Id. at 84-85.
¶ 24 DOC urges the court to use the factors delineated in Turner to dispose of this case. However, Turner does not resolve the present dispute since it merely provided the framework for determining whether a prison regulation was reasonable on its face. The present claim does not involve a facial challenge to a prison policy. McNabb contests the constitutionality of the policy as applied to him. Therefore, the factors outlined in Turner do not assist the court with balancing the competing interests of McNabb and DOC. The twin principles set forth in Turner do inform the disposition of this case by identifying an additional state interest that should be considered when determining whether the State's interests prevail over the right to refuse artificial means of nutrition and hydration in the prison setting.
¶ 25 Turner calls for judicial deference to the decisions of prison administrators in light of their unique interest in maintaining security and day-to-day order. Id. at 85, 107 S.Ct. 2254. In turn, Washington courts have adopted this basic premise when evaluating facial challenges to prison policies and regulations. See In re Pers. Restraint of Gronquist, 138 Wash.2d 388, 405, 978 P.2d 1083 (1999) (citing Turner for the proposition that Washington courts accord particular deference to the "professional expertise" of prison officials in "the day to day operation of prisons"); Sappenfield v. Dep't of Corrs., 127 Wash.App. 83, 88, 110 P.3d 808 (2005) (citing Turner for the proposition that "[m]atters affecting a prison's internal security are generally the province of prison administrators, not the courts"); In re Pers. Restraint of Arseneau, 98 Wash.App. 368, 374-76, 989 P.2d 1197 (1999) (noting that the "lenient" reasonableness standard of Turner controls where prison security and administration motivate the policy or regulation at issue); In re Pers. Restraint of Goulsby, 120 Wash.App. 223, 231, 84 P.3d 922 (2004) (citing Turner for the proposition that "[t]he courts recognize that the prison system should not be micromanaged by the courts, particularly as to issues relating to prison security").
¶ 26 Consonant with Turner and the majority view amongst our sister states, we conclude that the unique demands of prison administration warrant judicial deference to prison administrative decisions. We hold *1265 that this principle should be considered in addition to the four established compelling state interests adopted by Colyer when determining whether the right of an incarcerated individual to refuse artificial means of nutrition and hydration outweigh the State's interests. Therefore, the court will weigh McNabb's right to refuse artificial means of nutrition and hydration against the existence of five compelling state interests: (1) the maintenance of security and orderly administration within the prison system, (2) the preservation of life, (3) the protection of innocent third parties, (4) the prevention of suicide, and (5) the maintenance of the ethical integrity of the medical profession.
¶ 27 Applying the above interests to the facts of this case, we conclude that the State's interests in applying DOC's force-feeding policy to McNabb outweigh his right to refuse artificial means of nutrition and hydration.
¶ 28 First, the State has a compelling interest in maintaining security and orderly administration in its prison system. Prison administration is the unique province of the State and should be afforded due deference by the courts. Turner, 482 U.S. at 85, 107 S.Ct. 2254; see also Nat'l Elec. Contractors Ass'n v. Riveland, 138 Wash.2d 9, 21, 978 P.2d 481 (1999) ("Judicial deference has been typically accorded to measures relating to prison management of inmate discipline and institutional security."). Further, state prisons occupy a caretaking role with respect to inmates. By statute, DOC must provide "basic medical services as may be mandated by the federal Constitution and the Constitution of the state of Washington."[10] RCW 72.10.005. It follows that the courts should give prison officials due deference regarding the manner in which the officials carry out their mandate to provide medical services to incarcerated individuals.
¶ 29 McNabb was intubated pursuant to DOC policy that states, "[o]ffenders in total confinement shall be provided with the nutrition necessary to preserve their health and life" and that authorizes staff to force-feed an inmate under certain conditions.[11] CP at 22. Here, the DOC force-feeding policy as applied to McNabb promotes the State's mandate to provide basic medical services. Allowing McNabb to disrupt the policy is inimical to the State's interest in orderly prison administration.
¶ 30 McNabb argues that the dearth of evidence in the record regarding the effect of his fast on other inmates and prison staff precludes the court from concluding that his fast jeopardizes prison security and internal order. Conversely, DOC urges the court to adopt the position of other jurisdictions which recognize that it is likely that allowing an inmate to starve himself will give rise to internal disruptions.
¶ 31 Other jurisdictions have noted that they ordinarily defer to prison officials' expert judgment and that an inmate's death by starvation while in state custody can have an unpredictable negative effect on security and order in the prison. Senecal, 666 A.2d at 809; Commonwealth v. Kallinger, 134 Pa. Cmwlth. 415, 580 A.2d 887, 891 (1990). We agree. It is logical to infer that an inmate's slow death by starvation would have an unpredictable and deleterious effect on both prison staff and the prison population. Therefore, the State's interest in orderly *1266 prison administration is implicated by McNabb's refusal of artificial means of nutrition and hydration.
¶ 32 Second, the State has a strong interest in the preservation of life where medical treatment will in fact save the patient's life. Colyer, 99 Wash.2d at 123, 660 P.2d 738. This interest is weakened where medical treatment will simply prolong life and the treatment is highly invasive. Id. Colyer, for example, involved a patient in a chronic vegetative state who required a respirator to breathe. Id. at 116, 660 P.2d 738. The court determined that the State's interest in the preservation of Colyer's life was weakened because the medical treatment merely prolonged her life by highly invasive means. Id. at 122-23, 660 P.2d 738.
¶ 33 McNabb argues that the State's interest in preserving his life is meaningless if it "denigrates" that life by imposing such an invasive procedure like force-feeding against his will, Br. of Appellant at 15. However, our case law compels a different conclusion. Colyer addressed the issue of removing life-sustaining treatment. Here, we examine the issue of refusing life-saving treatment. Unlike the patient in Colyer, McNabb does not suffer from a terminal condition and DOC's application of its force-feeding policy does not merely temporarily relieve a chronic condition but restores McNabb to a naturally healthy condition. Therefore, the State does have a compelling interest in preserving McNabb's life.
¶ 34 Third, the State has a compelling interest in protecting innocent third parties. Typically, the court considers the interests of the patient's dependents and family members. See Colyer, 99 Wash.2d at 123, 660 P.2d 738 (observing that the State did not have an interest in protecting third parties where the patient lacked children and her immediate family members supported the decision to withdraw life support); In re President & Dirs. of Georgetown Coll., Inc., 118 U.S.App. D.C. 80, 331 F.2d 1000 (1964) (ordering a blood transfusion out of consideration for the patient's young child). Accordingly, McNabb is correct in his assertion that the State lacks a compelling interest on this count given that he has no dependents. Further, the court is not aware of any contesting family members.
¶ 35 Fourth, the State has a compelling interest in the prevention of suicide. In Colyer, we determined that removal of life support is not suicide. We concluded that death resulting from removal of life support is from "natural causes, neither set in motion nor intended by the patient." Colyer, 99 Wash.2d at 123, 660 P.2d 738; Grant, 109 Wash.2d at 564, 747 P.2d 445.[12] Therefore, the State lacks a compelling interest in the prevention of suicide where the patient would naturally die due to causes neither set in motion nor intended by the patient.
¶ 36 McNabb's actions fail to meet the two-part proviso set forth in Colyer. First, if DOC honored McNabb's refusal of artificial means of nutrition and hydration, McNabb would die by starvation  a force that he set in motion. Second, McNabb has made clear that he intends to die as a result of refusing artificial means of nutrition and hydration. In the words of McNabb, "`[m]y only wish is for my personal decision not to eat to be respected and to be left in peace for my fast to take its course.'" Br. of Appellant at 2 (quoting CP at 7). Therefore, death resulting from McNabb's refusal of artificial means of nutrition and hydration will consummate his intent to die. Under these circumstances, the State has a compelling interest in preventing McNabb's intentional death.
¶ 37 Fifth, the State has a compelling interest in the maintenance of the ethical integrity of the medical profession. DOC argues that allowing McNabb to refuse artificial means of nutrition and hydration is tantamount to physician-assisted suicide and is therefore unethical. Br. of Resp't at 15. McNabb argues that involuntary nasogastric *1267 intubation violates medical ethics. Pet. for Review at 11-12. Previous cases have addressed this interest from the vantage point of whether a doctor may remove life support and still fulfill his or her ethical duty to preserve life. Colyer, 99 Wash.2d at 123, 660 P.2d 738; Grant, 109 Wash.2d at 557, 747 P.2d 445. In Colyer and Grant, we determined that a doctor's role in caring for a terminally ill patient could validly include facilitating the patient's comfort in light of the slight chance of survival apart from the life support. 99 Wash.2d at 123, 109 Wash.2d at 557.
¶ 38 Both Colyer and Grant are factually distinct from McNabb's circumstances. McNabb is not terminally ill and artificial means of nutrition and hydration were the only means by which DOC could restore his health. Accordingly, we decline to place medical professionals in the ethically tenuous position of fulfilling the death order of an otherwise healthy incarcerated individual. Therefore, we conclude that here the State has a compelling interest in maintaining the ethical integrity of the medical profession.
¶ 39 Finally, we must determine whether DOC's force-feeding policy as applied to McNabb is narrowly drawn. The Schuoler court held that the imposition of invasive medical treatment upon an involuntarily committed patient was narrowly drawn where the treatment was "necessary and effective" to furthering an identified compelling state interest. 106 Wash.2d at 509, 723 P.2d 1103. McNabb abstained from eating for five months preceding his arrival to AHCC. According to DOC policy, McNabb would have been identified as an at-risk inmate, informed of the adverse medical consequences of his actions, and encouraged to eat voluntarily. By itself, failure to eat is insufficient to justify force-feeding under this policy. If an inmate continues to refuse food and drink, as McNabb did, then medical staff must issue a written determination that the inmate's health is immediately threatened before the superintendent is authorized to approve force-feeding. McNabb does not present any evidence that DOC deviated from its policy, and, therefore, we must assume DOC followed its own procedures. Under these conditions, DOC's application of the force-feeding policy was necessary and effective.

V. CONCLUSION
¶ 40 We conclude that it is well settled that the privacy guaranty contained in article I, section 7 of the state constitution warrants an independent state constitutional analysis of the right to refuse artificial means of nutrition and hydration. However, the protection afforded by the state constitution is coextensive with the federal constitution. We find that McNabb has a limited right of privacy as an incarcerated individual but the State's interests in orderly administration of the prison system, preservation of life, prevention of suicide, and maintenance of the ethical integrity of the medical profession outweigh McNabb's limited right. We affirm the Court of Appeals.
WE CONCUR: SUSAN OWENS, JAMES M. JOHNSON, JJ., and BOBBE J. BRIDGE, J. Pro Tern.
MADSEN, J. (concurring).
¶ 41 I concur in the result reached by the lead opinion. However, I do not believe that the Turner[1] balancing test is necessary or appropriate in this case. Prisoners who are otherwise healthy have no right to refuse artificial means of nutrition and hydration in an effort to end their lives. Contrary to the inference of the dissent, Charles McNabb is not conducting a hunger strike  he is attempting to commit suicide. The extraordinary intervention in this case was initiated only when medical staff issued a written determination that McNabb's health was threatened. McNabb has no right to starve himself to death by refusing sustenance while in the custody of the State  this is not a privacy right that citizens of the state hold or expect to hold.
¶ 42 I write separately to express my disagreement with the lead opinion's premise that there is a right to refuse artificial means of nutrition and hydration on the part of individuals who do not suffer from a terminal *1268 or incurable illness or a severe and permanent mental and physical deterioration. Our precedent expressly states that "in the absence of countervailing state interests, a person has the right to have life-sustaining treatment withheld where he or she (1) is in an advanced stage of a terminal and incurable illness, and (2) is suffering severe and permanent mental and physical deterioration." In re Guardianship of Grant, 109 Wash.2d 545, 556, 747 P.2d 445 (1987).
¶ 43 Mr. McNabb's privacy rights are not violated by the force-feeding at issue because he is not in an advanced stage of a terminal or incurable illness, nor does he suffer from a severe and permanent mental and physical deterioration. He therefore has no right to refuse life-sustaining treatment.
¶ 44 The State's Natural Death Act, chapter 70.122 RCW, carries out the constitutional right. It provides that "adult persons have the fundamental right to control the decisions relating to the rendering of their own health care, including the decision to have life-sustaining treatment withheld or withdrawn in instances of a terminal condition or permanent unconscious condition." RCW 70.122.010 (emphasis added). "`Life-sustaining treatment'" includes "artificially provided nutrition and hydration, to sustain . . . a vital function, which, when applied to a qualified patient, would serve only to prolong the process of dying." RCW 70.122.020(5). "Terminal condition" means "an incurable and irreversible condition . . . that, within reasonable medical judgment, will cause death within a reasonable period of time . . . and where the application of life-sustaining treatment serves only to prolong the process of dying." RCW 70.122.020(9). Like this court's cases addressing the constitutional right, the state statutes recognize that the right to refuse nutrition and hydration exists only in the case of a terminal illness.
¶ 45 The lead opinion, however, expands the constitutional privacy right by granting to an otherwise healthy and competent individual the right to refuse nutrition and hydration, subject only to compelling state interests that might outweigh the right. Our cases hold that only when an individual is in an advanced stage of a terminable or incurable disease or is suffering from severe and permanent mental and physical deterioration does the individual have the constitutional right to refuse nutrition and hydration.
¶ 46 As explained, the Natural Death Act is to the same effect. RCW 70.122.010 addresses health care decisions, first stating the broad proposition that adults have the right to make decisions relating to their health care. It then identifies a subset of this category of decisions, i.e., decisions pertaining to life-sustaining treatment. The statute limits the decision-making right with respect to this subset of decisions because it expressly states that an adult has the right to make decisions relating to life-sustaining treatment "in instances of a terminal condition or permanent unconscious condition." RCW 70.122.010. Not only does the statute fail to state or imply that healthy adults have the right to make decisions relating to termination of life-sustaining treatment, it affirmatively provides that only terminally ill or permanently unconscious adults have this right.
¶ 47 The lead opinion's analysis conflicts with both the constitutional right as this court has explained it and with the Natural Death Act, which implements the constitutional right.
¶ 48 Because it is clear that McNabb has no right to refuse force-feeding through involuntary nasogastric intubation, I concur with the lead opinion in result only.
WE CONCUR: GERRY L. ALEXANDER, C.J., and CHARLES W. JOHNSON and TOM CHAMBERS, JJ.
SANDERS, J. (dissenting).
¶ 49 Charles McNabb, while at Eastern State Hospital, was force-fed by a tube through his nose. He was strapped into a chair for 28 hours straight, during which time it was impossible for him to sleep. From the force-feeding he suffered bleeding from the nose for a day, pain, and nausea. Shortly after being transferred to the custody of the Department of Corrections (DOC), *1269 the DOC also force-fed Mr. McNabb for several days.[1]
¶ 50 The lead opinion condones the DOC's practice of force-feeding Mr. McNabb, a practice tantamount to torture,[2] because supposedly the DOC's interest in its policy outweighs Mr. McNabb's interest to avoid such treatment. Lead op. at 1265. The concurrence condones the DOC practice because Mr. McNabb is not terminally ill. Concurrence at 1267. I cannot agree with either position. Under our state constitution Mr. McNabb's right to refuse involuntary nasogastric intubation,[3] an essential privacy right of autonomous decision-making and bodily integrity, yields only to "authority of law." Const, art. I, § 7.
¶ 51 The lead opinion incorrectly frames the privacy interest at stake as the right to suicide. This case is no more about the right to suicide than Lawrence v. Texas, 539 U.S. 558, 123 S.Ct. 2472, 156 L.Ed.2d 508 (2003), was about the right to sodomy. Rather, this case is about "the most comprehensive of rights and the right most valued by civilized men," namely, "the right to be let alone." Olmstead v. United States, 277 U.S. 438, 478, 48 S.Ct. 564, 72 L.Ed. 944 (1928) (Brandeis, J., dissenting), overruled in part by Berger v. New York, 388 U.S. 41, 87 S.Ct. 1873, 18 L.Ed.2d 1040 (1967). Once incorrectly framed, the lead opinion and concurrence easily strike down its "straw man"[4] because our prior case law, based on federal precedent, limits the right to die to terminally ill patients only.
¶ 52 Nowhere does Mr. McNabb state a wish to commit suicide. His "only wish is for [his] personal decision not to eat to be respected and to be left in peace for [his] fast to take its course." Clerk's Papers at 7 (Decl. of Charles B. McNabb). In other words, he wishes "to be let alone." Olmstead, 277 U.S. at 478, 48 S.Ct. 564 (Brandeis, J., dissenting).
¶ 53 Furthermore, the right of terminally ill patients to refuse food and water under the federal constitution does not answer the question of whether Mr. McNabb may live free from the State's invasion of his body under our state constitution. Our guaranty of privacy is not found in the unstated "penumbra" of federal rights but is explicit in our state constitution: "[n]o person shall be disturbed in his private affairs . . . without authority of law." Const, art. I, § 7.
¶ 54 The plain language of article I, section 7 sets forth a simple two part test:[5] Whether a person's private affairs are being disturbed, and, if so, is the disturbance under "`authority of law'"? State v. Surge, 160 Wash.2d 65, 71, 156 P.3d 208 (2007). Unquestionably, force-feeding disturbs a "private affair" protected by article I, section 7. See lead op. at 1264; see also Surge, 160 Wash.2d at 71, 156 P.3d 208 ("The `private affairs' inquiry focuses on `those privacy interests which citizens of this state have held, and should be entitled to hold, safe from governmental trespass absent a warrant.'" (internal quotation marks omitted) (quoting *1270 State v. Young, 123 Wash.2d 173, 181, 867 P.2d 593 (1994))). The only issue remaining is whether the DOC acted under "authority of law."
¶ 55 "Authority of law" is a warrant. Surge, 160 Wash.2d at 71, 156 P.3d 208 ("In general terms, the `"authority of law"' required by article I, section 7 is satisfied by a valid warrant."); see also State v. Day, 161 Wash.2d 889, 893, 168 P.3d 1265 (2007) ("[O]ur state constitution . . . requires actual authority of law before the State may disturb the individual's private affairs."). But here there was no warrant. Under an independent state constitutional analysis, that should end the discussion.[6]
¶ 56 Nevertheless, our court has opined a rule under the federal constitution to permit an intrusion into a person's "private affairs" upon a showing of a compelling interest with the intrusion narrowly tailored to achieve that interest. In re Juveniles A, B, C, D, E, 121 Wash.2d 80, 97, 847 P.2d 455 (1993). Yet this case arises under the Washington State Constitution; the federal rule and our precedents surrounding that rule are therefore irrelevant. See Surge, 160 Wash.2d at 78, 156 P.3d 208 ("[A] close reading of the case reveals that not only was Juveniles A, B, C, D, E decided under Fourth Amendment jurisprudence, but the types of privacy interests referred to originate from Fourteenth Amendment jurisprudence right to privacy, not article I, section 7."); see also State v. Evans, 159 Wash.2d 402, 412, 150 P.3d 105 (2007) ("[A]rticle I, section 7 of our state constitution provides a strong privacy interest, exceeding that provided by the federal constitution.").
¶ 57 More importantly, strict scrutiny analysis has no place in our article I, section 7 jurisprudence, which is based on a completely different text. The federal constitution does not even mention "privacy," whereas it is express in article I, section 7. Moreover, "strict scrutiny" was not even invented by the United States Supreme Court until 1938,[7] nor applied until 1942,[8] both well after, our state constitution was ratified in 1889. There is nothing in the text of our constitution that even implies this approach.
¶ 58 Under our state constitution an individual's "private affairs" simply cannot be abridged, even for a compelling reason, absent "authority of law." Const, art. I, § 7. This is because privacy is by definition anti-majoritarian, protecting an individual's private affairs from majority intrusion. As such, an invasion of a privacy interest can never be justified by some majoritarian belief, no matter how compelling.
¶ 59 Even more disturbing than the lead opinion's "balancing" of our privacy right against some majoritarian government bias is the concurrence's conditioning our right to privacy on the existence of a terminal illness. Concurrence at 1267-68. The right to bodily integrity, the inner sanctum of all that is "private," is absolute under our state constitution; there is no basis to conclude terminally ill people have any superior right to bodily integrity than nonterminally ill people. The concurrence's notion to this effect is abhorrent to our tradition of equality.
¶ 60 Moreover, the concurrence's claim a statute may limit the scope of a constitutionally protected right finds no support in our case law and is inconsistent with our form of government. See Tunstall v. Bergeson, 141 Wash.2d 201, 218, 5 P.3d 691 (2000) ("`The ultimate power to interpret, construe and enforce the constitution of this State belongs *1271 to the judiciary.'" (quoting Seattle Sch. Dist. No. 1 v. State, 90 Wash.2d 476, 496, 585 P.2d 71 (1978))); Leonard v. City of Spokane, 127 Wash.2d 194, 198, 897 P.2d 358 (1995) (quoting same); Philadelphia II v. Gregoire, 128 Wash.2d 707, 714, 911 P.2d 389 (1996) ("[T]he construction of the meaning and scope of a constitutional provision is exclusively a judicial function." (citing State ex rel. Munro v. Todd, 69 Wash.2d 209, 213, 417 P.2d 955 (1966); Wash. State Highway Comm'n v. Pac. Nw. Bell Tel. Co., 59 Wash.2d 216, 222, 367 P.2d 605 (1961))); Scott Paper Co. v. City of Anacortes, 90 Wash.2d 19, 33, 578 P.2d 1292 (1978) ("The legislature has no power to define the meaning of a constitutional provision."); see also City of Boerne v. Flores, 521 U.S. 507, 519, 117 S.Ct. 2157, 138 L.Ed.2d 624 (1997) ("Congress does not enforce a constitutional right by changing what the right is."). As Chief Justice Marshall powerfully stated:
It is, emphatically, the province and duty of the judicial department to say what the law is. . . . [I]f both the law and the constitution apply to a particular case, so that the court must either decide that case, conformably to the law, disregarding the constitution; or conformably to the constitution, disregarding the law; the court must determine which of these conflicting rules governs the case: this is of the very essence of judicial duty. If then, the courts are to regard the constitution; and the constitution is superior to any ordinary act of the legislature, the constitution, and not such ordinary act, must govern the case to which they both apply.
Those, then, who controvert the principle, that the constitution is to be considered, in court, as a paramount law, are reduced to the necessity of maintaining that courts must close their eyes on the constitution, and see only the law. This doctrine would subvert the very foundation of all written constitutions. . . .
Marbury v. Madison, 5 U.S. (1 Cranch) 137, 177-78, 2 L.Ed. 60 (1803).
¶ 61 Lastly, the concurrence's reliance on In re Guardianship of Grant, 109 Wash.2d 545, 747 P.2d 445 (1987), to limit the scope of article I, section 7 is misplaced. A closer reading of Grant reveals not only was the case decided under federal constitutional grounds, but the only reference to article I, section 7 was to support the federal rule, not to limit its scope.[9]
¶ 62 Our Declaration of Rights protects individuals from majority oppression. As such, these rights are not subject to majority rule or majority interests. Nonetheless, were I to mistakenly walk the path the lead opinion sets before me, none of the State's interests is compelling nor is the DOC policy narrowly tailored.

The DOC Fails to Present a Compelling Interest
¶ 63 According to the lead opinion the DOC presents five compelling interests: (1) maintenance of prison security and administration, (2) preserving life, (3) protecting third parties, (4) preventing suicide, and (5) maintaining the ethical integrity of the medical profession. Lead op. at 1264-65. After hasty analysis the lead opinion finds four of these interests outweigh Mr. McNabb's right to bodily integrity. It is unclear whether any one of these interests is sufficient to outweigh McNabb's right to bodily integrity because the lead opinion does not provide such clarity.
¶ 64 Another reason the lead opinion lacks clarity as to whether an inmate's right to refuse food might ever outweigh the State's interests is the lead opinion's balancing of interests. Such "balancing" allows courts and parties alike great discretion in determining (or arguing) when the rights/interests of one party outweigh the rights/interests of another, resulting in malleable and unpredictable law. See Crawford v. Washington, 541 U.S. 36, 68-69, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004) ("By replacing categorical constitutional guarantees with open-ended *1272 balancing tests, we do violence to their design. Vague standards are manipulable. . . ."). Moreover, the lead opinion gives deference to the government at the expense of the individual notwithstanding our duty of impartiality between parties. See Code of Judicial Conduct, Canon 3(A)(5).
¶ 65 The lead opinion affords DOC substantial deference by assuming the existence of DOC's first compelling interest (prison security and administration) without the benefit of a single affidavit or example of a deleterious effect on prison staff or population, making the DOC's burden to demonstrate a compelling interest significantly lighter. Lead op. at 1265 (citing Turner v. Safley, 482 U.S. 78, 85, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987)). However, the greater the intrusion into a protected interest, the greater the necessity for some factual basis to support the prison official's assertions. See Turner, 482 U.S. at 97-99, 107 S.Ct. 2254 (holding the penological interest in completely restricting marriage was unsupported by the record); see also Joel K. Greenberg, Note, Hunger Striking Prisoners: The Constitutionality of Force-Feeding, 51 FORDHAM L.REV. 747, 766 (1983).
¶ 66 Here, absent any supporting evidence from DOC the lead opinion concludes, "[i]t is logical to infer that an inmate's slow death by starvation would have an unpredictable and deleterious effect on both prison staff and the prison population." Lead op. at 1265. This speculative inference alone convinces the lead opinion a compelling interest exists sufficient to justify the most coercive intrusion into Mr. McNabb's body.
¶ 67 How is making the prison staffs job more palatable sufficiently compelling to justify intruding into Mr. McNabb's bodily integrity? How does respecting Mr. McNabb's bodily integrity result in prisoner unrest? Is not prisoner unrest more likely when prisoners learn they have lost the right to bodily integrity? Moreover, assuming death is the result of Mr. McNabb's fast, is it not equally, if not more, logical to infer inmates will follow his lead when they learn they are protected from that result? See Graham Zellick, The Forcible Feeding of Prisoners: An Examination of the Legality of Enforced Therapy, 1976 PUB.L. 153, 175.
¶ 68 Mr. McNabb is not fasting to manipulate or seek favors from prison officials.[10] He has signed a health care directive pursuant to RCW 70.122.030, indicating his intent (should he be diagnosed to be in terminal or permanent unconscious condition) to exercise his right to refuse medical or surgical treatment and to accept the consequences of such refusal.
I am declining to eat for personal reasons. I am competent to make this choice. I have not been declared incompetent. . . . I am not using my fast as a means to seek or ask for any special privileges or favors or otherwise attempt to manipulate the system. My only wish is for my personal decision not to eat to be respected and to be left in peace for my fast to take its course. . . . I have no dependents or anyone else relying on me for support. My decision not to eat affects only me.
Decl. of Charles B. McNabb.
¶ 69 McNabb's refusal to eat is a private and personal choice. Because DOC presented no evidence (only mere conjecture) that Mr. McNabb's refusal of food and drink will disrupt prison administration, the DOC unnecessarily violates McNabb's right to bodily integrity.
¶ 70 The lead opinion declares the DOC's second interest (preservation of life) exists because "the State has a strong interest in the preservation of life where medical treatment will in fact save the patient's life." Lead op. at 1266 (citing In re Welfare of Colyer, 99 Wash.2d 114, 123, 660 P.2d 738 (1983), overruled in part by In re Guardianship, of Hamlin, 102 Wash.2d 810, 689 P.2d 1372 (1984)). Yet "the value of life is desecrated not by a decision to refuse medical *1273 treatment but `by the failure to allow a competent human being the right of choice.'" In re Guardianship of Farrell, 108 N.J. 335, 349, 529 A.2d 404, 411 (1987) (quoting In re Conroy, 98 N.J. 321, 343, 350, 486 A.2d 1209 (1985)).
¶ 71 The lead opinion perceives a distinction in our case law between "removing life-sustaining. treatment [and] refusing life-saving treatment." Lead op. at 1266. According to the lead opinion "McNabb does not suffer from a terminal condition and DOC's application of its force-feeding policy does not merely temporarily relieve a chronic condition but restores McNabb to a naturally healthy condition." Id.
¶ 72 The distinction between life-sustaining treatment and life-saving treatment is irrelevant.[11] We all suffer from this terminal condition requiring food to sustain our life, some of us more than others. Like the respirator artificially inflating the lungs until the next breath, force-feeding artificially fills the stomach until the next feeding. The only distinction between the two is the time interval involved before the next artificial intervention is necessary to sustain life. Force-feeding does not cure a need to eat any more than forced breath cures the need to breathe. Both conditions are chronic and incurable.
¶ 73 Furthermore, force-feeding an inmate in the interest of his or her purported "welfare" is disingenuous at best. See In re Caulk, 125 N.H. 226, 236, 480 A.2d 93 (1984) (Douglas, J., dissenting) ("The majority's reliance on the fact that Mr. Caulk is not facing death from a terminal illness ignores the nonphysical quality of life and reduces the quality of life to mere physical well-being.").
¶ 74 Force-feeding will not rehabilitate Mr. McNabb or contribute to his welfare; by contrast, force-feeding is degrading and cruel. As this court noted in Grant, 109 Wash.2d at 560, 747 P.2d 445, "advanced methods of providing nutrition and hydration, while often safe, are not without risks. These are sophisticated medical procedures whose benefits must be weighed against their burdens." Patients requiring nutrition and hydration are "subjected to highly invasive and intrusive procedures." Id.
¶ 75 This court has previously referred to the State's interest in protecting "the sanctity"[12] of life. Colyer, 99 Wash.2d at 122, 660 P.2d 738. If the State truly seeks to preserve the "sanctity" of inmates' lives, force-feeding prisoners does precisely the opposite by dehumanizing them. Respecting a person's bodily integrity recognizes the sanctity of life, namely a person's life is his alone, it is not owned by the State. To say otherwise justifies slavery. One's bodily integrity  the ultimate privacy protected under article I, section 7  is simply beyond the power of the State absent that "authority of law" provided by a warrant, obviously absent here.
¶ 76 Analyzing the State's third interest (protecting third parties) the lead opinion admits, "the State lacks a compelling interest on this count given that [McNabb] has no dependents." Lead op. at 1266.
¶ 77 The lead opinion declares the State's fourth interest (the prevention of suicide) exists because McNabb set in motion and intended to cause his death. Lead op. at 1266. The lead opinion distinguishes a terminally ill patient refusing life-saving treatment from McNabb, id., since under our case law persons in advanced stages of terminal and incurable illnesses are entitled to withdraw or withhold medical treatment. See Grant, 109 Wash.2d at 559, 747 P.2d 445. Our prior decisions suggest the State's interest to prevent suicide is implicated where a patient's death is "set in motion [or] intended by the patient." Id. at 556-57, 747 P.2d 445; Colyer, 99 Wash.2d at 123, 660 P.2d 738.
*1274 ¶ 78 McNabb correctly points out the bizarre ramifications of the State's interest in preventing suicide being implicated when death is set in motion or intended by the patient. A literal interpretation of Grant and Colyer suggests an individual whose death is "set in motion" because of his own actions loses the right to refuse life-sustaining treatment. By extension, does this mean the State could force a woman with a life-threatening pregnancy to submit to an abortion? Or could the State force an inmate who contracted lung cancer after years of smoking to undergo chemotherapy? Technically, both of these "conditions" were "set in motion" by the individual. And yet, forcing an abortion or cancer treatment upon an inmate is unthinkable to most. Likewise, since the State's interest in preventing suicide is based on theological doctrine, its constitutional validity is questionable.[13]
¶ 79 Properly stated, the State's prevention of suicide interest is concerned with preventing irrational acts of self-destruction, the impulsive act of irreparable consequence. See Superintendent of Belchertown State Sch. v. Saikewicz, 373 Mass. 728, 744 n. 11, 370 N.E.2d 417 (1977). Fasting, however, is not an impulsive act of irreparable consequence but a daily commitment and affirmation of belief.[14] As Judge Benjamin Cardozo eloquently stated, "[e]very human being of adult years and sound mind has a right to determine what shall be done with his own body." Schloendorff v. Soc'y of N.Y. Hosp., 211 N.Y. 125, 129, 105 N.E. 92 (1914). This includes fasting for whatever reason.
¶ 80 More importantly, however, the lead opinion never explains why Mr. McNabb's presumed motivation for fasting is relevant to the recognition of his constitutional right. Do we condition the exercise of religion on proper motivation? How about speech? Do we say to a woman, "you may get an abortion but only if we agree with your motives"? The lead opinion designs "a brave new world,"[15] where right thinkers have rights and wrong thinkers are subservient to the will of the masses.
¶ 81 Why Mr. McNabb wants to live free from governmental intrusion into his body is irrelevant to whether he has the right to live free from governmental intrusion into his body. Mr. McNabb is not incompetent, and we should recognize his right to refuse force-feeding.
¶ 82 Finally, the lead opinion concludes its fifth state interest (the maintenance of medical ethics) weighs in favor of the government. Lead op. at 1266. To this I simply point to the World Medical Association, of which the American Medical Association is a member, and its policy prohibiting the force-feeding of hunger striking prisoners. World Med. Ass'n, World Medical Association Declaration on Hunger Strikers princ. 3 (1992) (revised by the World Med Ass'n Gen. Assembly, Oct. 2006), available at http://www.wma. net/e/policy/h31.htm (last visited Mar. 5, 2008) ("Forced feeding contrary to an informed and voluntary refusal is unjustifiable. Artificial feeding with the hunger striker's explicit or implied consent is ethically acceptable."); see also Physicians for Human Rights, Forced Feeding of Gitmo Detainees Violates International Medical Code of Ethics (Sept. 16, 2005), available at http:// physiciansforhumanrights.org/library/news-2005-09-16.html (last visited Mar. 5, 2008).

DOC Policy Is Not Narrowly Tailored
¶ 83 Once the State's compelling interests have been identified, the federal doctrine relied *1275 upon by the lead opinion requires the State to prove its actions are narrowly tailored to achieve that compelling interest. Lead op. at 1267.
¶ 84 As discussed above, the record does not contain a single affidavit or example of a deleterious effect on prison staff or population. Nor does the record indicate Mr. McNabb was examined in order to determine the seriousness of his condition. Nor does the record indicate Mr. McNabb's suicidal intentions. Given the paucity of the record it is impossible to determine whether the DOC's policy is narrowly tailored to achieve a single compelling interest. More critically, however, the DOC policy permits force-feeding of prisoners in the absence of any compelling interests.
¶ 85 The lead opinion adequately explains the DOC policy, lead op. at 1265 n. 11, but fails to recognize the breadth of the policy's terms; the DOC policy is not written in terms of any compelling interest. Under the DOC policy, once a prisoner has not eaten for three days, for whatever reason, the DOC may label the prisoner as "at risk" and begin force-feeding. How is this narrowly tailored to maintain prison security or to respect life or to prevent suicide? It seems to me the only purpose of this policy is to exercise control over the only thing remaining to Mr. McNabb, his body.
"[T]he only purpose for which power can be rightfully exercised over any member of a civilised community, against his will, is to prevent harm to others. His own good, either physical or moral, is not a sufficient warrant. He cannot rightfully be compelled to do or forbear because it will be better for him to do so, because it will make him happier, because, in the opinion of others, to do so would be Wise, or even right."
John Stuart Mill, On Liberty, in 43 Great Books of the Western World 271 (Robert Maynard Hutchins ed., 1952), quoted in Caulk, 125 N.H. at 236, 480 A.2d 93 (Douglas, J., dissenting). Nor is the lead opinion convincing in its reliance on In re Detention of Schuoler, 106 Wash.2d 500, 723 P.2d 1103 (1986), to show narrow tailoring where treatment was "`necessary and effective.'" Lead op. at 1267 (quoting Schuoler, 106 Wash.2d at 509, 723 P.2d 1103). First, Schuoler addressed, on federal constitutional grounds, whether an involuntarily committed person, who by definition suffers from a disabling mental disorder, may refuse electroconvulsive therapy. Schuoler, 106 Wash.2d at 508 n. 4, 723 P.2d 1103. Mr. McNabb suffers from no mental disorder nor does he bring his case under federal constitutional grounds. More critically, however, the lead opinion "assume[s] DOC followed its own procedures" and concludes, "[u]nder these conditions, DOC's application of the force-feeding policy was necessary and effective." Lead op. at 1267.

Conclusion
¶ 86 It is true that "many rights and privileges are subject to limitation in penal institutions because of paramount institutional goals and policies." State v. Hartzog, 96 Wash.2d 383, 391, 635 P.2d 694 (1981) (citing Bell v. Wolfish, 441 U.S. 520, 545-46, 555, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979); Wolff v. McDonnell, 418 U.S. 539, 555-56, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974); Rhodes v. Chapman, 452 U.S. 337, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981)). Yet this is no excuse for the lead opinion's disregard of our state constitution's clear textual mandate nor the lead opinion's hasty acceptance of DOC's unsupported justifications of its force-feeding policy. Article I, section 7 guarantees a right to privacy, with no penal exception, and "`[t]here is no iron curtain drawn between the Constitution and the prisons of this country.'" Hartzog, 96 Wash.2d at 391, 635 P.2d 694 (quoting Wolff, 418 U.S. at 555-56, 94 S.Ct. 2963). An essential element of privacy is the ability to define for ourselves the meaning and direction of our life. This ability is never balanced against the public's interest, regardless of how compelling that interest is professed to be. To deprive an individual of this ability is to rob one of his personhood.
¶ 87 Article I, section 7 promises certain private spheres of individual conduct are beyond government reach. This promise embodies the "moral fact that a person belongs to himself and not others nor to society as a *1276 whole." Charles Fried, Correspondence, 6 Phil. & Pub. Aff. 288-89 (1977), quoted in Thornburgh v. Am. Coll. of Obstetricians & Gynecologists, 476 U.S. 747, 777 n. 5, 106 S.Ct. 2169, 90 L.Ed.2d 779 (1986) (Stevens, J., concurring). Permitting DOC to force-feed Mr. McNabb breaks this promise.
¶ 88 Forced feeding clearly violates Mr. McNabb's article I, section 7 right to bodily integrity. As such it may be accomplished only under "authority of law." No authority is present here and even under an inapplicable strict scrutiny analysis, the DOC has neither identified a compelling interest nor proved its policy is narrowly tailored.
¶ 89 I dissent.
NOTES
[1] Article I, section 7 of the Washington Constitution states, "[n]o person shall be disturbed in his private affairs, or his home invaded, without authority of law."
[2] The record is limited because the trial court granted summary judgment for the State sua sponte before the parties had an opportunity for discovery. McNabb states that he has not eaten voluntarily since February 5, 2004. McNabb also states that he was force-fed on one occasion while at Eastern State Hospital in either December 2003 or January 2004.
[3] The dissent begins, "Charles McNabb, while at Eastern State Hospital, was force-fed by a tube through his nose. He was strapped into a chair for 28 hours straight, during which time it was impossible for him to sleep. From the force-feeding he suffered bleeding from the nose for a day, pain and nausea." Dissent at 1268. The dissent leaves the impression that what allegedly occurred at Eastern State Hospital (ESH) five months prior to McNabb's arrival to AHCC is relevant to this case. It is not. McNabb challenges the constitutionality of the force-feeding policy at AHCC. There are no allegations against ESH. See Pet. for Review at 1-2; Br. of Appellant at 2. All McNabb says about DOC's force-feeding is "I arrived at Airway Heights Corrections Center on or about July 12, 2004. Within one or two days afterward, the medical staff inserted a tube through my nose and into my stomach to force-feed me. I was force-fed through the tube for several days." Clerk's Papers (CP) at 7.
[4] Grant, 109 Wash.2d 545, 747 P.2d 445; In re Welfare of Colyer, 99 Wash.2d 114, 660 P.2d 738 (1983); Smith v. Shannon, 100 Wash.2d 26, 666 P.2d 351 (1983); Keogan v. Holy Family Hosp., 95 Wash.2d 306, 622 P.2d 1246 (1980); Ze Barth v. Swedish Hosp. Med. Ctr., 81 Wash.2d 12, 499 P.2d 1 (1972).
[5] The individuals' conditions in those cases varied, but all involved nonincarcerated individuals who had some form of terminal or debilitating condition. See, e.g., Grant, 109 Wash.2d at 556, 747 P.2d 445 (terminally ill and severely impaired both physically and mentally); Colyer, 99 Wash.2d at 120, 660 P.2d 738 (incurably and terminally ill); Schuoler, 106 Wash.2d at 507, 723 P.2d 1103 (mentally ill). For the sake of brevity, we use the nonspecific phrase "terminal or debilitating condition" in the remainder of this opinion unless quoting or citing a source that describes the individual's condition with particularity.
[6] In only one case, the court concluded that the State's compelling interest in ordering electro-convulsive therapy (ECT) for a mentally disabled woman outweighed her right to refuse treatment. Schuoler, 106 Wash.2d at 508, 723 P.2d 1103. While agreeing with prior Washington precedent that the woman had a right to be free from an unwanted ECT, the court nevertheless concluded that the State had a compelling interest in treating Schuoler because her repeated admissions to medical facilities created a financial burden for the State. Id. at 509, 723 P.2d 1103.
[7] Two courts in other jurisdictions did not recognize the right of competent individuals to refuse artificial means of nutrition and hydration in analyzing the rights of inmates. Commonwealth v. Kallinger, 134 Pa.Cmwlth. 415, 580 A.2d 887, 889-90 (1990); Von Holden v. Chapman, 450 N.Y.S.2d 623, 87 A.D.2d 66, 68-70 (N.Y.App.Div. 1982). Both courts focused their analysis on the right of an inmate to commit suicide rather than on the more generalized right to refuse medical treatment. Kallinger, 580 A.2d at 890-93; Chapman, 87 A.D.2d at 67-70, 450 N.Y.S.2d 623. One court recognized an unspecified right to privacy and held that "`[t]he State has no right to monitor this man's physical condition against his will; neither does it have the right to feed him to prevent his death from starvation if that is his wish.'" Zant v. Prevatte, 248 Ga. 832, 286 S.E.2d 715, 716 (1982) (quoting superior court order).
[8] The concurrence maintains that the Natural Death Act (NDA), chapter 70.122 RCW, affirmatively excludes the right of nonterminally ill individuals to refuse medical treatment. Concurrence at 1268. The NDA concerns the right of adult individuals to refuse life sustaining treatment which "serves only to prolong the process of dying" given that the person's condition is terminal or permanent. RCW 70.122.020(9). McNabb endured a medical treatment that effectively saved him from the condition hastening his death, and therefore the NDA is inapplicable here.
[9] In Turner, prisoners claimed that a prison regulation was unconstitutional because it required prisoners to have a compelling reason and obtain the superintendent's permission before they could marry. 482 U.S. at 82, 107 S.Ct. 2254. The court acknowledged that the right to marry was fundamental but held that it was appropriate to apply a lesser standard of review in evaluating the constitutionality of the prison regulation. Id. at 89, 107 S.Ct. 2254. Unlike the strict scrutiny that is applied to violations of the fundamental rights of the nonincarcerated, Turner held that "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." Id.
[10] See also Estelle v. Gamble, 429 U.S. 97, 103, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976) (state must provide medical care for incarcerated individuals).
[11] First, the policy directs staff to identify inmates who are "at risk," based on two criteria:

1. When any staff member receives information that an offender has not participated in the food service program for more than 72 hours; or
2. When any staff member receives information that an offender is failing to participate in the food service program to the extent that the offender's health may be in jeopardy.
CP at 22. Second, if a staff member identifies an inmate as "at risk," the superintendent may transfer the inmate to a facility for medical treatment and medical staff is authorized to examine the inmate, encourage him or her to eat and drink voluntarily, and explain the medical risks of not eating and drinking. Id. at 23-24. Third, if the inmate continues to refuse food and drink, the policy authorizes the superintendent to approve force-feeding, based on a written determination by medical staff that the inmate's life or health is immediately threatened by the refusal of food and drink. Id. at 24.
[12] In Colyer, the patient lived in a chronic, vegetative state as a result of a cardiopulmonary arrest from which she suffered severe brain damage due to lack of oxygen for ten minutes. 99 Wash.2d at 116, 660 P.2d 738. In Grant, we determined that, absent medical intervention, the patient would die due to complications from Batten disease. 109 Wash.2d at 564, 747 P.2d 445. Under both of these circumstances, we concluded that the prevention of suicide was not a valid consideration.
[1] Turner v. Safley, 482 U.S. 78, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987).
[1] The lead opinion claims what happened at Eastern State Hospital is irrelevant, lead op. at 1259 n. 3, yet it does not claim force-feeding at DOC was any different. If the lead opinion believes the physical and mental pain from such a procedure is irrelevant, then I beg to differ.
[2] See George J. Annas, Human Rights Outlaws: Nuremberg, Geneva, and the Global War on Terror, 87 B.U.L.Rev. 427, 457 (2007).
[3] I would characterize the right at issue as the right to refuse force-feeding because that right is more definite and enforceable and because Mr. McNabb frames his asserted right in those terms. See Reply Br. of Appellant at 1 ("This case concerns a fundamental human right  the right to protect one's own body against forced invasion."); id. at 3 (stating whether there exists a "right to refuse force-feeding" warrants independent state constitutional analysis); id. at 4 ("McNabb retains the right to refuse involuntary treatment, including force-feeding."); id. at 5 ("Whatever might be the outer limits of the state constitutional right to privacy, the right to refuse force-feeding is at its core.").
[4] The "fallacy of the straw man" is an informal logical fallacy created when an easily refutable position is attributed to an opponent deliberately to overstate the opponent's position. RUGGERO J. ALDISERT, LOGIC FOR LAWYERS: A GUIDE TO CLEAR LEGAL THINKING 170 (1989).
[5] "Appropriate constitutional analysis begins with the text and, for most purposes, should end there as well." Malyon v. Pierce County, 131 Wash.2d 779, 799, 935 P.2d 1272 (1997).
[6] That is unless the State can argue its warrantless intrusion into Mr. McNabb's protected sphere of privacy falls into one of our jealously guarded exceptions. See, e.g., Day, 161 Wash.2d at 894, 168 P.3d 1265. An exception does not clearly apply nor did the DOC argue one.
[7] United States v. Carolene Prods. Co., 304 U.S. 144, 153 n. 4, 58 S.Ct. 778, 82 L.Ed. 1234 (1938) (the famous footnote four introduced the idea of different levels of judicial review); see also Louis Lusky, Footnote Redux: A Carolene Products Reminiscence, 82 COLUM. L.REV. 1093 (1982).
[8] Skinner v. Oklahoma ex rel. Williamson, 316 U.S. 535, 541, 62 S.Ct. 1110, 86 L.Ed. 1655 (1942) (applying strict scrutiny analysis to an Oklahoma law requiring the sterilization of persons convicted of three or more felonies involving moral turpitude); see also Adam Winkler, Fatal in Theory and Strict in Fact: An Empirical Analysis of Strict Scrutiny in the Federal Courts, 59 VAND. L.REV. 793, 799 (2006) ("The Supreme Court first used the precise term `strict scrutiny' in 1942's Skinner v. Oklahoma[, 316 U.S. at 541, 62 S.Ct. 1110]. . . . ").
[9] Grant, 109 Wash.2d at 553 n. 1, 747 P.2d 445 (citing In re Welfare of Colyer, 99 Wash.2d 114, 120, 660 P.2d 738 (1983), which states, "[s]upport for this holding [that an adult suffering from an incurable illness has a constitutional right to refuse lifesaving treatment] is also found in our state constitution. Const, art. 1, § 7," overruled in part by In re Guardianship of Hamlin, 102 Wash.2d 810, 689 P.2d 1372 (1984)).
[10] By contrast, in Zant v. Prevatte, 248 Ga. 832, 833, 286 S.E.2d 715 (1982), the purpose of the inmate's hunger strike was to get the attention of the prison officials and receive protective custody. The Georgia Supreme Court held the inmate "by virtue of his right of privacy, can refuse to allow intrusions on his person, even though calculated to preserve his life." Id. at 834, 286 S.E.2d 715. The court continued, "[t]he State has not shown such a compelling interest in preserving Prevatte's life, as would override his right to refuse medical treatment." Id.
[11] The lead opinion's distinction is also not borne out in the case law. Compare Application of President & Dirs. of Georgetown Coll., Inc., 118 U.S.App. D.C. 80, 331 F.2d 1000 (1964) (ordering blood transfusion to be given to Jehovah's Witness to save her life), with In re Osborne, 294 A.2d 372 (D.C. 1972) (upholding Jehovah's Witness's refusal of a life-saving blood transfusion). The religious motivation behind these examples is irrelevant to the bright-line life-sustaining/life-saving treatment distinction perceived by the lead opinion.
[12] "[S]anctity" is defined as "holiness of life and character" the "quality or state of being holy or sacred." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 2009 (2002).
[13] Our culture's prohibition of suicide is founded in St. Augustine's City of God and the early church's concern of Christian extremists seeking suicide as a means to achieve life everlasting. G. STEVEN NEELEY, THE CONSTITUTIONAL RIGHT TO SUICIDE: A LEGAL & PHILOSOPHICAL EXAMINATION 48, 52 (Peter Lang Publ'g 1996); see also GLANVILLE WILLIAMS, THE SANCTITY OF LIFE AND THE CRIMINAL LAW 255 (1957).
[14] Christ was tempted each day of his 40 day fast in the wilderness. Luke 4:1-13. For a description of the physical effects of fasting see Steven C. Bennett, Note, The Privacy and Procedural Due Process Rights of Hunger Striking Prisoners, 58 N.Y.U. L.REV. 1157, 1158 n. 3 (1983); Stephanie Clavan Powell, Comment, Constitutional Law  Forced Feeding of a Prisoner on a Hunger Strike: A Violation of an Inmate's Right to Privacy, 61 N.C. L.REV. 714, 723 n. 70 (1983).
[15] WILLIAM SHAKESPEARE, THE TEMPEST act 5, sc. 1.