COMMISSIONER OF CORRECTION *v.*
WILLIAM B. COLEMAN
(SC 18721)

Rogers, C. J., and Norcott, Palmer, Zarella, McLachlan, Eveleigh and Harper, Js.

---

Argued October 25, 2011—officially released March 13, 2012

*William E. Murray*, with whom were *David McGuire* and, on the brief, *Aubrey E. Ruta* and *Michael T. Grant*, for the appellant (defendant).

*Lynn D. Wittenbrink*, assistant attorney general, with whom were *Ann E. Lynch*, assistant attorney general, and, on the brief, *Neil Parille*, assistant attorney general, *George Jepsen*, attorney general, and *Richard Blumenthal*, former attorney general, for the appellee (plaintiff).

*Martha F. Davis* and *Hope R. Metcalf* filed a brief for Professors of Law, Human Rights and Bioethics as amici curiae.

*Opinion*

NORCOTT, J. Broadly stated, the issue raised in this appeal[1] is whether the state of Connecticut may force-feed an inmate who is engaged in a hunger strike as a form of protest. The defendant, William B. Coleman, appeals from the judgment of the trial court granting the application of the plaintiff, Theresa C. Lantz, the former commissioner of correction (commissioner),[2] for a permanent injunction permitting the department of correction (department) to forcibly restrain and feed the defendant to prevent life-threatening dehydration and malnutrition. On appeal, the defendant contends that the trial court improperly determined that: (1) the state's interests outweigh the defendant's common-law right to bodily integrity; (2) the forcible administration of artificial nutrition and hydration to the defendant does not violate his right to free speech and privacy under the first and fourteenth amendments to the United States constitution; and (3) international law

---

[1] The defendant appealed from the judgment of the trial court to the Appellate Court, and we transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

[2] When this action commenced, the named plaintiff, Theresa C. Lantz, was the commissioner of correction. The current commissioner is Leo C. Arnone.

does not prohibit the force-feeding of the defendant. We disagree and, accordingly, affirm the judgment of the trial court.

The record reveals the following relevant facts and procedural history. The defendant currently is serving a fifteen year sentence, execution suspended after eight years, with a maximum discharge date of December 30, 2012, at the McDougall-Walker correctional institution following his convictions on charges pertaining to his relationship with his ex-wife. On September 17, 2007, approximately two weeks after the Appellate Court issued its decision affirming his convictions, the defendant began a hunger strike. At that time, he weighed approximately 237 pounds. On January 9, 2008, by which time the defendant's weight had dropped to 162 pounds, the commissioner sought both a temporary and a permanent injunction authorizing the department to restrain and force-feed the defendant if it became medically necessary given the health risks associated with hunger strikes. In response, the defendant asserted several special defenses, including the common law, constitutional and international law grounds raised in this appeal.[3] On January 23, 2008, the trial court granted the temporary injunction, with a trial set to follow on the permanent injunction.

Following a trial to the court, the trial court granted the commissioner's application for a permanent injunction. In its memorandum of decision, the trial court found the following facts. "[The defendant] has been determined to be mentally competent every time he has been evaluated during his incarceration. [He] has never been diagnosed as suicidal. He is presently engaged in

---

[3] The defendant's special defenses also included claims that force-feeding is legally impermissible because of his living will and that force-feeding him constitutes cruel and unusual punishment in violation of the eighth amendment to the United States constitution. The defendant has not pursued these claims on appeal.

a protest, taking the form of a hunger strike . . . protesting what he claims to be a broken family and criminal judicial system that led to his wrongful conviction. [The defendant] maintains that he is innocent of the crimes of which he was convicted. [He] also insists that his conviction is a form of ongoing abuse to his two sons . . . with whom he has had no contact since his conviction in 2005, and who are in the sole custody of his ex-wife. Through his protest, [the defendant] wants to raise awareness of what he perceives to be the misuse and abuse of the criminal and family judicial system; in particular, the assertion of false criminal allegations in the context of divorce proceedings.

"The defendant clearly knows about the dangers of organ failure and death that could result from the refusal of nutrition, having had many discussions about such problems with [the department's] health staff and having heard the testimony at the temporary injunction hearing. [The defendant] insists that the termination of his protest does not depend on receiving anything from the [department], or the outcome of his habeas corpus proceedings[4] or the outcome of this case. He is clearly willing to continue this protest with no goal, other than the vague one of publicizing his perception of defects in the justice system."

The trial court also noted the following events that had ensued subsequent to its order granting the temporary injunction. Throughout the course of his hunger strike, the defendant's voluntary ingestion of nutrients and liquids has varied: at some points, the defendant has voluntarily consumed ice chips, milk, orange juice, coffee and tea, or a liquid nutritional supplement; at other points, he has refused to ingest food or liquids in any form. Approximately one year after his hunger strike began, the defendant stated that the strike

---

[4] The defendant failed to prevail on his habeas petition.

"need[ed] to be cranked up again," at which point he ceased all oral intake, including fluids. As a result of increasing signs of dehydration, on September 22, 2008, when the defendant's weight was just 139 pounds, Edward Blanchette, a physician and the clinical director of the department, determined that forced intravenous hydration was necessary to prevent death or irreversible harm.

"On October 16, 2008, [the defendant] said 'I lost another [eight] pounds. I didn't think I would be going much longer,' and 'I don't want to go to church but I'd like to see a priest.' Beginning that day, the defendant showed low values of potassium, which is an important electrolyte to regulate certain bodily processes, putting the defendant at risk for heart irritability and cardiac [arrhythmias]. The defendant weighed 129 pounds on October 17, 2008. On October 23, 2008, Blanchette determined that the defendant was at an ever increasing risk of sudden death or irreversible complications because of his hunger strike. Blanchette determined that it was necessary to place a nasogastric . . . tube through which liquid nutritional supplement would be given unless the defendant would agree to voluntarily accept at least some liquid nourishment. The defendant declined, so a [nasogastric] tube was placed for the first time on October 23, 2008.

"[The defendant] had been told on a number of occasions that if he was to be force-fed, it would be through a [nasogastric] tube, which would be inserted through his nose and threaded down into his stomach. This is the simplest, safest method and the preferred procedure to provide artificial nutrition. The [nasogastric] tube utilizes the gastrointestinal system, and, in general, has fewer risks of complication than any other artificial nutrition method. Placing [a nasogastric] tube does not usually cause pain and is normally well tolerated.

"[Suzanne] Ducate [a physician and director of psychiatric services of the department] has never had any patient experience . . . great pain with the placement of a [nasogastric] tube. That includes patients of smaller stature than the defendant, as well as persons receiving a larger diameter [nasogastric] tube. The placement of a [nasogastric] tube is neither a difficult nor a risky procedure; doctors are trained in the placement of such tubes in their first year as medical students by practicing on each other. Serious complications from the placement of a [nasogastric] tube are rare.

"On October 27, 2008, a second [nasogastric] feeding was done. [The defendant] claims he suffered excruciating pain on each occasion. He refused to sip water, however, to facilitate the insertion of the tube into his large nasal cavities and down his throat. On each occasion, he twisted during the procedure and the [nasogastric] tube kinked on the first attempt but was successfully placed on the second attempt. Contrary to his assertion, he did not vomit. There was no perforation of his mucosa. A liquid nutritional supplement was inserted directly into [the defendant's] stomach via the [nasogastric] tube on each occasion.

"After the second feeding, [the defendant] resumed taking liquid nutritional supplements. . . . By December 1, 2008, he weighed 154 pounds. For the next two months, his weight was relatively stable. . . . Since the time he started taking nutritional supplements in late October of 2008, his health and appearance [had] improved markedly. But it is clear that [the defendant] may resume his fasting at any time and that, but for the [intravenous fluid] and [nasogastric] intervention, he would have died long before [the] trial [on the permanent injunction]. It is also clear that if the [department] lacked the legal means to force-feed him during his incarceration, he would starve to death before his sentence is completed.

"Inmates outnumber staff in Connecticut prisons and [the] staff carry no weapons inside the prison. Behavioral protests in a prison setting are not allowed by the [department] because of their negative impact on security and safety, having led to disturbances and riots in Connecticut prisons in the past. When there is a death in a correctional facility, the facility is locked down, meaning that all normal activities such as showers, work, school assignments, religious services, recreational activities, visits and substance abuse programs cease, and often inmates are fed in their cells.

"Inmates expect [the department] staff to intervene and protect them and other inmates from harm and become upset when that does not happen. If correctional staff does not intervene when another inmate is harming himself, the staff will have difficulty with the inmates. It is [then Deputy Director Brian] Murphy's opinion that allowing [the defendant] to die via his hunger strike would adversely affect [the department] staff's ability to do their job safely and securely.

"Suicides and suicide attempts are considered security risks in prison, both to the life of the self-harming inmate as well as [to] other inmates. Inmates react when there is a suicide attempt or a suicide. When an inmate either attempts or commits suicide or other self-injurious behavior, other inmates require higher levels of counseling, and sometimes engage in the same types of behavior. Ducate is of the opinion that there is a greater than 70 percent likelihood that if [the defendant] were permitted to starve to death, there would be similar reactions as to other inmate suicides. Inmates would be distressed, would go on [hunger strikes] themselves, and would attempt suicide. She is also of the opinion that, with the media attention surrounding [the defendant's] protest, inmates would quickly find out [about the defendant's] death, regardless [of] whether it occurred at a prison or at a hospital, and the impact

on other inmates in correctional facilities would be the same. She is of the opinion that if [the defendant] were permitted to starve himself, other inmates would mimic or copycat his behavior.

"Permitting the defendant in this case to die would also adversely impact staff morale. Inmate deaths upset [department] staff members, and allowing a healthy inmate to die would certainly lower staff morale. It is probable that some staff would require time off, would have to visit the employee assistance program for state employees, and would require counseling. Staff morale impacts security within correctional facilities.

"Even an inmate in just a generally weakened condition from [a] lack of nutrition presents a security issue in a correctional setting. Staff can be required to intervene for a variety of reasons, including increased vulnerability to other inmates. Monitoring a hunger striker requires a significant commitment of limited resources in a prison setting, causing additional security and order concerns.

"[Additionally] since September, 2007, a significant amount of medical and custodial staff time, and resources ha[ve] been dedicated to caring for the defendant because of his self-induced hunger strike. He has taken an inordinate amount of Blanchette's and Ducate's time. Staff has been utilized to restrain or monitor the defendant on a frequent basis, impacting their ability to respond to another emergency in the prison. In addition, [the defendant] has been occupying, for much of the time since September, 2007, 1 of only 124 prison infirmary beds available in a correctional setting for approximately 20,000 inmates and needed for patients with mental health or physical ailments."

On the basis of the foregoing facts, the trial court determined that the commissioner had met the burden of proof as to the application and that the defendant

could not prevail on his special defenses. Accordingly, that court granted the commissioner's application for a permanent injunction. The trial court authorized the commissioner to treat the defendant by means of hospitalization, intravenous fluids and nourishment, nasogastric feeding, and any other health care measures medically necessary to preserve his life and health, by use of reasonable force if necessary. The court ordered the commissioner, however, to first inquire whether the defendant intends to physically resist and, until and unless he did so on any one occasion, not to restrain him for such procedures. This appeal followed. Additional facts will be set forth as necessary.

We begin our analysis by reviewing the standard of review following the grant of a permanent injunction. "A party seeking injunctive relief has the burden of alleging and proving irreparable harm and lack of an adequate remedy at law. . . . A prayer for injunctive relief is addressed to the sound discretion of the court and the court's ruling can be reviewed only for the purpose of determining whether the decision was based on an erroneous statement of law or an abuse of discretion. . . . Therefore, unless the trial court has abused its discretion . . . the trial court's decision must stand." (Internal quotation marks omitted.) *Maritime Ventures, LLC* v. *Norwalk*, 277 Conn. 800, 807–808, 894 A.2d 946 (2006). "How a court balances the equities is discretionary but if, in balancing those equities, a trial court draws conclusions of law, our review is plenary." (Internal quotation marks omitted.) *New Breed Logistics, Inc.* v. *CT INDY NH TT, LLC*, 129 Conn. App. 563, 571, 19 A.3d 1275 (2011). For the reasons set forth hereinafter, we conclude that the trial court did not abuse its discretion in granting the commissioner's application for a permanent injunction and, accordingly, affirm the judgment of the trial court.

I

The defendant first claims that the permanent injunction violates his state common-law right to bodily integrity. Specifically, he contends that the trial court improperly determined that this right is outweighed by the commissioner's claimed interests in preserving life, preventing suicide, protecting innocent third parties and preserving the security and orderly administration of Connecticut prisons. We disagree.

This court has recognized that " '[n]o right is held more sacred, or is more carefully guarded, by the common law, than the right of every individual to the possession and control of his own person, free from all restraint or interference of others, unless by clear and unquestionable authority of law.' . . . In the context of a medical malpractice action based on the doctrine of informed consent, we stated: 'Every human being of adult years and sound mind has a right to determine what shall be done with his own body; and a surgeon who performs an operation without his patient's consent commits an assault, for which he is liable in damages.' . . . *Schmeltz* v. *Tracy*, 119 Conn. 492, [495–96], 177 A. 520 (1935); see also *Logan* v. *Greenwich Hospital Assn.*, 191 Conn. 282, 288–89, 465 A.2d 294 (1983). In yet another closely related context, the United States Supreme Court has . . . reiterated that the 'notion of bodily integrity has been embodied in the requirement that informed consent is generally required for medical treatment'; *Cruzan* v. *Director, Missouri Dept. of Health*, 497 U.S. 261, 269, 110 S. Ct. 2841, 111 L. Ed. 2d 224 (1990); and that '[t]he logical corollary of the doctrine of informed consent is that the patient generally possesses the right not to consent, that is, to refuse treatment.' Id., 270; see also id., 277 ('the common law doctrine of informed consent is viewed as generally encompassing the right of a competent individual to refuse medical treatment')." (Citation omitted.) *Stam-*

*ford Hospital* v. *Vega*, 236 Conn. 646, 664–65, 674 A.2d 821 (1996). Accordingly, a competent adult has the right to embark voluntarily on a hunger strike wherein he may refuse to eat or to accept artificial nutrition and hydration, even when such artificial sustenance would be necessary to prevent his death or irreversible bodily harm.

Nevertheless, the United States Supreme Court has explained that when considering the related constitutional right to bodily integrity,[5] "[l]awful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system." *Price* v.

---

[5] We note that, at trial, the defendant contended that granting the injunction would violate: (1) his right to privacy and bodily self-determination under both Connecticut common law and article first, § 7, of the constitution of Connecticut; and (2) his right to privacy and bodily self-determination under the fourteenth amendment to the United States constitution. On appeal, the defendant has limited his bodily integrity claim to one arising solely from the common law. Although we limit our analysis in accordance with the claims as stated on appeal, as we explain in part II of this opinion, there is substantial overlap in the analysis under the common law and the analysis that generally applies for analyzing these constitutional claims. This relationship is unsurprising in light of the historical roots of substantive due process. See *Washington* v. *Glucksberg*, 521 U.S. 702, 720–21, 117 S. Ct. 2258, 138 L. Ed. 2d 772 (1997) ("Our established method of substantive-due-process analysis has two primary features: First, we have regularly observed that the [d]ue [p]rocess [c]lause specially protects those fundamental rights and liberties which are, objectively, deeply rooted in this [n]ation's history and tradition . . . and implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if they were sacrificed . . . . Second, we have required in substantive-due-process cases a careful description of the asserted fundamental liberty interest. . . . Our [n]ation's history, legal traditions, and practices thus provide the crucial guideposts for responsible decisionmaking . . . that direct and restrain our exposition of the [d]ue [p]rocess [c]lause." [Citations omitted; internal quotation marks omitted.]); see also *State* v. *Garcia*, 233 Conn. 44, 79–80, 658 A.2d 947 (1995) (rejecting claim that state common law provided defendant with "liberty interest broader or more absolute than arises as a matter of substantive due process under the federal constitution, in freedom from involuntary treatment to restore him to competency"). Therefore, we look to state and federal constitutional cases where relevant.

*Johnston,* 334 U.S. 266, 285, 68 S. Ct. 1049, 92 L. Ed. 1356 (1948). This court has stated: "It is true that, in general, where state action impinges upon a fundamental right, that action will be sustained only upon the showing of a compelling state interest that can only thus be protected. . . . Such analysis is not appropriate, however, in weighing the constitutionality of the conduct of state prison officials. . . . Restrictions on personal liberties that would be considered unacceptable where the general public is concerned are often essential within the strictures of the prison community. . . . The [United States] Supreme Court has indicated that in the prison environment a less demanding balancing test, instead, is to be applied. . . . [A] prison inmate retains those . . . rights that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system." (Citations omitted; internal quotation marks omitted.) *Roque* v. *Warden,* 181 Conn. 85, 97, 434 A.2d 348 (1980). Thus, we must determine whether the commissioner's interests outweigh the incarcerated defendant's common-law right to refuse nutrition and liquids without interference.

Although the question of whether a prison inmate may be force-fed during a hunger strike is a matter of first impression for this court, courts in other jurisdictions addressing this issue generally consider five factors when balancing the state's interests against the interest of the hunger striking prisoner. Those factors include the state's interest in: (1) the preservation of life; (2) the protection of the interests of innocent third parties; (3) the prevention of suicide; (4) the maintenance of the ethical integrity of the medical profession; and (5) the maintenance of security and the day-to-day order of the prison. See, e.g., *McNabb* v. *Dept. of Corrections,* 163 Wash. 2d 393, 403, 405, 180 P.3d 1257 (2008). The parties in the present case agree that these

factors apply to the defendant's common-law bodily integrity claim. Our resolution of this claim, therefore, is guided by the jurisprudence of these other jurisdictions.

In applying these factors, courts often determine that the states' interests outweigh those of the hunger striking inmates. For example, in *McNabb* v. *Dept. of Corrections*, supra, 163 Wash. 2d 393, the Washington Supreme Court concluded that the state's interests in applying the force-feeding policy of the defendant, the department of corrections, to the plaintiff, an inmate who had not eaten voluntarily for over five months, outweighed the inmate's right to refuse artificial means of nutrition and hydration. Id., 394–95, 411. Specifically, the court in *McNabb* concluded that the state had a compelling interest in maintaining security and orderly administration in its prison system and that "an inmate's slow death by starvation would have an unpredictable and deleterious effect on both prison staff and the prison population." Id., 408. The court disagreed with the inmate's argument that the state's interest in preserving his life is meaningless if it "denigrates" that life by imposing such an invasive procedure, including force-feeding the defendant against his will, and concluded that the force-feeding policy did not merely temporarily relieve a chronic condition, but rather restored the inmate to a naturally healthy condition. Id. The court further determined that the inmate's hunger strike implicated the state's interest in preventing suicide because the inmate would die by starvation if he were allowed to continue to refuse food, which the court determined was a force he had set in motion that, if unchecked, would lead to his death. Id., 409. Finally, the court "decline[d] to place medical professionals in the ethically tenuous position of fulfilling the death order of an otherwise healthy incarcerated individual," and concluded that the state had a compelling interest in maintaining the ethical integrity of the medical profession. Id., 410.

Similarly, in *In re Caulk*, 125 N.H. 226, 228–29, 480 A.2d 93 (1984), the New Hampshire Supreme Court concluded that the state's interests in maintaining an effective criminal justice system and in preserving life and preventing suicide prevailed over the privacy rights of a prisoner who refused to consume nourishment in an attempt to "die with dignity." The court determined that "prison officials will lose much of their ability to enforce institutional order if any inmate can shield himself from the administration's control and authority by announcing that he is on a starvation diet. Prisoners are not permitted to live in accordance with their own desires, nor may they be permitted to die on their own terms without adversely and impermissibly affecting the [s]tate's legitimate authority over inmates." Id., 231. The court also rejected the inmate's contention that he was simply allowing himself to die rather than affirmatively committing suicide, and determined that the state's interest in preserving life and preventing suicide dominated. Id., 232.

In other cases allowing the state to force-feed hunger striking inmates, courts have determined that the state's interest in prison administration, on its own, is a controlling factor. For example, in *People ex rel. Dept. of Corrections* v. *Millard*, 335 Ill. App. 3d 1066, 1068, 782 N.E.2d 966, cert. denied, 204 Ill. 2d 682, 792 N.E.2d 313 (2003), the Appellate Court of Illinois upheld the grant of an injunction allowing the department of corrections to force-feed an inmate serving a three year sentence who began a hunger strike to protest his transfer to a certain prison facility. The court held that the department of corrections may "force-feed a hunger-striking inmate, whose only purpose is to attempt to manipulate the system so as to avoid disruptive or otherwise detrimental effects to the orderly administration of [the] prison system." Id., 1074.

Indeed, in those cases in which courts have rejected the state's request to force-feed inmates, the state typically had failed to present evidence regarding one or more of the factors to establish a sufficient state interest to outweigh the inmate's right to be free from unwanted bodily intrusion. For example, in *Singletary* v. *Costello*, 665 So. 2d 1099, 1109–10 (Fla. App. 1996), the Florida's Fourth District Court of Appeal determined that, because the defendant inmate did not desire that his hunger strike produce his death, and because he had no minor children dependent upon him, the state's interests in preventing suicide and protecting innocent third parties were not implicated. The court emphasized that the state had failed to present any evidence regarding the maintenance of the ethical integrity of the medical profession or the undermining of security, safety or welfare within the prison as a result of the inmate's hunger strike. Id., 1109. Accordingly, that court concluded, under the factual circumstances before it, that "the state's interest in the preservation of life, in and of itself, cannot overcome [a defendant's] fundamental right to [forgo] life-sustaining medical intervention." Id. The court expressly noted, however, that it might reach a different result in another case wherein the state provides evidence sufficient to establish more of the factors to balance against an inmate's privacy right to refuse medical intervention. Id., 1110. Similarly, in *Zant* v. *Prevatte*, 248 Ga. 832, 286 S.E.2d 715 (1982), the Supreme Court of Georgia determined that, because the hunger striking inmate therein was not mentally incompetent, did not have dependents who relied on him for a means of livelihood, and the issue of religious freedom was not present, the state had failed to show "such a compelling interest in preserving [the inmate's] life, as would override his right to refuse medical treatment." Id., 834

Courts have also rejected states' requests to force-feed inmates when the state's interest in preserving the

inmate's life is diminished. For example, in *Hill* v. *Dept. of Corrections*, 992 A.2d 933, 939 (Pa. Commw. 2010), the trial court determined that a permanent injunction allowing the department of corrections to force-feed an inmate who had engaged in a series of hunger strikes was inappropriate where the state had not presented evidence to establish that the inmate's health was in imminent danger. The court did, however, invite the state to proceed with a permanent injunction action in the event that the inmate continued his hunger strike and his health became imminently threatened. Id., 940.

In *Thor* v. *Superior Court*, 5 Cal. 4th 725, 855 P.2d 375, 21 Cal. Rptr. 2d 357 (1993), the California Supreme Court determined that the state's interests did not outweigh the rights of a quadriplegic inmate deemed competent who had refused sustenance specifically with the purpose of ending his life. The court reasoned that, "[a]s the quality of life diminishes because of physical deterioration, the [s]tate's interest in preserving life may correspondingly decrease." (Internal quotation marks omitted.) Id., 740. The court noted that the state had expressed a limited interest in the prevention of suicide because it "imposes no criminal or civil sanction for intentional acts of self-destruction." Id., 741. The court also drew a distinction between one who sets in motion a course of events aimed at one's own demise, and one who simply rejects medical intervention that only prolongs, but never cures, a serious life-threatening or debilitating affliction. Id., 742. The court determined that there was no threat to the state's interest in maintaining the ethical integrity of the medical profession because respecting a patient's choice to forgo recommended—and even necessary—treatment does not denigrate professional standards of care. Id., 743. The state's interest in protecting innocent third parties was not implicated because the defendant did not have minor children. Id., 744. Finally, the court determined

that the state had offered no evidence to suggest that allowing the defendant to exercise his fundamental right to self-determination in medical decisions undermined prison integrity or endangered the public. Id., 745. Accordingly, the court refused to allow the state to force-feed the inmate. Id. The court acknowledged, however, that the "custodial environment is uniquely susceptible to the catalytic effect of disruptive conduct" and that in another case, if a change of circumstances warranted intervention to prevent disruption, the state may be able to establish a need to override an inmate's choice to decline medical intervention. Id., 745–46.

Turning to the present case, the trial court specifically found that the commissioner had presented evidence sufficient to establish the state's interests in: (1) preserving life; (2) preventing suicide; (3) protecting innocent third parties; and (4) maintaining the orderly administration of the prison system, and that such interests outweighed the defendant's right to refuse medical intervention.[6] We examine, in turn, the defendant's claims as to each of the state's interests.

## A

The defendant claims that there is no evidence demonstrating the commissioner's actual interest in preserving his life and that any such interest is weakened by the high degree of bodily invasion required to force-feed him. Specifically, the defendant contends that the commissioner's interest in preserving life is diminished because "the life that the [commissioner] is seeking to protect is the life of the same person who has competently decided to [forgo] the medical intervention." *Sin-*

---

[6] The trial court found that the commissioner had not established a sufficient interest in the maintenance of the ethical integrity of the medical profession because there was conflicting evidence concerning the ethical requirements of the defendant's treating physicians. Because the commissioner has not challenged that determination on appeal, we do not consider it.

*gletary* v. *Costello*, supra, 665 So. 2d 1109. The defendant further contends that "[t]he duty of the [s]tate to preserve life must encompass a recognition of an individual's right to avoid circumstances in which the individual himself would feel that efforts to sustain life demean or degrade his humanity." *Brophy* v. *New England Sinai Hospital, Inc.*, 398 Mass. 417, 434, 497 N.E.2d 626 (1986). We disagree that the principles cited in these cases necessitate a determination that the commissioner has not established an interest in preserving the defendant's life in the present case.

Connecticut has a policy of preserving life. Indeed, "doctors are trained . . . in order to provide care and treatment for sick and dying patients. The preservation of life is not only a laudable goal for . . . the physicians . . . to aspire to, it is a compelling one." (Internal quotation marks omitted.) *Stamford Hospital* v. *Vega*, supra, 236 Conn. 665. In accordance with this principle, the legislature has directed the department to "provide for the relief of any sick or infirm prisoner . . . ." General Statutes § 18-7. Thus, the commissioner has not only a compelling interest in preserving the life and health of the inmates in the custody of the department, but also a statutorily mandated duty to do so.

This court also has recognized the state's interest in preserving life when such life and health are at risk, including situations wherein the preservation of life required other constitutional rights to be subject to state intrusion. For example, the right to be free from unwarranted searches pursuant to the fourth amendment to the United States constitution is tempered by the recognition of an emergency exception wherein police officers may "enter a home without a warrant when they have an objectively reasonable basis for believing that an occupant is seriously injured or imminently threatened with such injury. . . . The need to protect or preserve life or avoid serious injury is justifi-

cation for what would be otherwise illegal absent an exigency or emergency." (Citation omitted; internal quotation marks omitted.) *State* v. *Fausel*, 295 Conn. 785, 794, 993 A.2d 455 (2010).

In the present case, the defendant is an otherwise healthy individual with no life-threatening conditions, nor does he suffer from any chronic, debilitating afflictions. Thus, administering artificial hydration and nutrition when it becomes medically necessary serves to restore the defendant to a naturally healthy condition. Compare *McNabb* v. *Dept. of Corrections*, supra, 163 Wash. 2d 408 (prison's force-feeding policy restored inmate to healthy condition), with *Thor* v. *Superior Court*, supra, 5 Cal. 4th 742 (court refused to allow state to force-feed quadriplegic inmate because, inter alia, state's interest in preserving life may decrease as inmate's quality of life diminishes due to physical deterioration, and because state had expressed limited interest in prevention of suicide), and *Brophy* v. *New England Sinai Hospital, Inc.*, supra, 398 Mass. 419 (state's interest in preservation of life via artificial maintenance of nutrition and hydration for person hospitalized in persistent vegetative state did not overcome patient's right to discontinue treatment).

The trial court in the present case found that the defendant's four year hunger strike had caused him to lose over 100 pounds—nearly one half of his starting body weight—at the height of his fasting. Prior to administering intravenous fluids or the nasogastric tube, Blanchette determined that the defendant was at an ever increasing risk of sudden death or irreversible complications because of his hunger strike, and that such measures were necessary to prevent imminent, permanent damage or death. Therefore, the defendant's hunger strike triggered the department's duty to preserve his life when it became clear that the hunger strike put his health in imminent danger. Indeed, given

that the defendant has declared that there is no specific event or accomplishment that will cause him to end his hunger strike, and that he is willing to continue the hunger strike until his death,[7] his life and health are in danger as long as his hunger strike persists.

[7] When asked about the reasons for his protest, the defendant testified: "The system in the state of Connecticut is broken and corrupt. . . . It is beyond repair at this point. It's hideously broken and hideously corrupt. . . . The criminal and family courts, are just not capable of deciphering the truth or willing to consider the truth." We also note the following colloquy between the defendant and his counsel:

"Q. Have you made any specific demands of the [department], which, if they were met, would cause you to end your protest?

"A. Demands, no. Absolutely, no.

"Q. And is your protest—the continuation of your protest dependent upon the outcome of your habeas corpus proceeding?

"A. No.

"Q. Is it dependent upon the outcome of these proceedings right here?

"A. No.

"Q. Do you want to die, Mr. Coleman?

"A. No, I do not.

"Q. And is the goal of your protest to die?

"A. The goal is not to die, no. I have a willing—I am willing to take that risk."

When asked by the commissioner's counsel whether he was currently willing to die on his hunger strike, the defendant replied: "Willing to, yes." The defendant also engaged in the following colloquy with the court:

"The Court: . . . [I]t's been—there's been testimony that you're not suicidal, but that you are sincere in your belief, that you will continue your protest until your death. Do you agree with that?

"[The Defendant]: I'm willing to take the risk. I do not want to die, Your Honor, but there's more people that are affected by this than just me. And I won't be the last. . . .

"The Court: . . . [B]ut you're telling me, I want to understand this, that you're willing—that you are willing to continue your protest up to and including your death. Is that accurate?

"[The Defendant]: That's accurate.

"The Court: And there's no particular goal that you're seeking during this protest?

"[The Defendant]: None, other than to say this is what it is and whoever wants to view that, can view that.

"The Court: And so logically, what would stop your protest, short of death, if there's no goal you're seeking?

"[The Defendant]: . . . For instance, somebody said to me, well, what if [you are] vindicated? Well, if I'm vindicated, there's no protest. I—I start to eat food, albeit very slowly, obviously."

With respect to the defendant's claim that the method that the state employs diminishes its interest, we note that force-feeding is less invasive than other forced medical treatments this court previously has condoned because it is not designed to alter the defendant's mind or will. See *State* v. *Seekins*, 299 Conn. 141, 166–67, 8 A.3d 491 (2010) (allowing order of involuntary medication to render defendant competent to stand trial). Additionally, the state presented evidence that the nasogastric tube is the simplest, safest and least invasive method of administering artificial nutrition. A nasogastric tube does not require puncturing the defendant's skin or blood vessels, and it utilizes the defendant's normal digestive system to process the nutrients administered. Indeed, Blanchette testified that every other option for providing artificial nutrition is more complicated, more risky and, most importantly, more invasive. Accordingly, we conclude that the trial court did not abuse its discretion in determining that granting the injunction is consistent with Connecticut's public policy in favor of, and the commissioner's interest in, preserving the defendant's life.

B

The defendant next claims that the commissioner's interest in preventing suicide is not implicated because the goal of his hunger strike is not to cause his own death, but rather to draw attention to the unfairness he perceives in the judicial process. We agree with the commissioner's contention that the trial court appropriately rejected the defendant's argument that starving himself to death is not suicide because it yields the same result as suicide: self-inflicted death.

The legislature has made clear the state's interest in preventing suicide by determining that assisting in a suicide is a criminal offense. See General Statutes §§ 53a-54a and 53a-56 (a). In fact, the legislature has

resisted several attempts to amend § 53a-56 (a) to decriminalize physician assisted suicide, even for terminally ill patients.[8] Moreover, the legislature has established involuntary commitment proceedings to provide immediate care and treatment for suicidal individuals; see General Statutes § 17a-502 (a);[9] as well as exceptions to criminal liability for using force against another person in order to thwart a suicide attempt. See General Statutes § 53a-18 (4).[10]

Specifically with respect to inmate suicide, courts have recognized that "incarceration can place a person under unusual psychological strain and the jail or prison under a commensurate duty to prevent the prisoner from giving way to the strain. The analysis is applicable when suicide takes the form of starving oneself to death." *Freeman* v. *Berge*, 441 F.3d 543, 547 (7th Cir. 2006). In order to fulfill its duty to prevent inmates within its care from committing suicide, the department has a set of policies, procedures and administrative directives, and department officers and staff undergo extensive training specifically to facilitate the prevention of suicide. The department, therefore, has a right and a duty to intervene to prevent prisoners from setting in motion forces that will cause their own deaths.

[8] See, e.g., Senate Bill 361, "An Act Concerning Physician-Assisted Suicide," (1994); House Bill 6928, "An Act Concerning Death With Dignity," (1995); Senate Bill 334, "An Act Concerning Physician Assisted Suicide," (1995); Senate Bill 1138, "An Act Concerning Death With Dignity," (2009).

[9] General Statutes § 17a-502 (a) provides in relevant part: "Any person who a physician concludes has psychiatric disabilities and is dangerous to himself or others . . . and is in need of immediate care and treatment in a hospital for psychiatric disabilities, may be confined in such a hospital . . . for not more than fifteen days without order of any court . . . ."

[10] General Statutes § 53a-18 provides in relevant part: "The use of physical force upon another person which would otherwise constitute an offense is justifiable and not criminal under any of the following circumstances . . .

"(4) A person acting under a reasonable belief that another person is about to commit suicide or to inflict serious physical injury upon himself may use reasonable physical force upon such person to the extent that he reasonably believes such to be necessary to thwart such result. . . ."

Although death may not be the defendant's professed goal, he has stated that he is willing to die in order to continue his protest, and the trial court found that his death inevitably would be the result if he were allowed to continue his hunger strike without intervention. Unlike other cases in which courts have determined that the hunger striker's actions did not implicate the state's interest in preventing suicide because the goal of the protest was limited to a specific desired outcome; see, e.g., *Singletary* v. *Costello*, supra, 665 So. 2d 1109 ("purpose of the hunger strike was to bring about change, not death"); there is no specific goal or occurrence—other than his eventual death—that will terminate the defendant's hunger strike while he remains in prison. See footnote 7 of this opinion. Although the defendant did testify that "vindicat[ion]" would cause him to end his hunger strike, he has provided no indication as to what event or occurrence would provide such vindication. Thus, the trial court properly could have concluded that the defendant will continue his hunger strike until he has completed his sentence and is released from prison, or until he effectuates his own death, whichever occurs first. Accordingly, the trial court did not abuse its discretion in determining that the permanent injunction was consistent with the state's interest in preventing suicide.

C

The defendant further contends that, because there was no evidence presented either that he will be responsible for any child support upon his release, or that his minor children, from whom he is estranged, will suffer emotional harm should he be allowed to continue his hunger strike until his death, the trial court abused its discretion in finding that the commissioner had estab-

lished its interest in protecting innocent third parties.[11] We disagree.

"Generally . . . concern [for the protection of innocent third parties] arises when the refusal of medical treatment endangers public health or implicates the emotional or financial welfare of the [inmate's] minor children." *Thor* v. *Superior Court*, supra, 5 Cal. 4th 744. In *Polk County Sheriff* v. *District Court*, 594 N.W.2d 421, 428 (Iowa 1999), although the defendant inmate refusing medical treatment had stated that he had no concern regarding how his death might affect his minor children, the Iowa Supreme Court determined: "[W]e can still consider the emotional impact upon them. Additionally, we cannot presume that [the defendant] would never be in a position to provide financial support to them." Although that court did not deem the interest in protecting innocent third parties to be controlling, it stated that "we must still weigh this factor in the balance, and we do so in favor of compelling treatment." Id.

We conclude that a similar treatment by the trial court was appropriate in the present case. "[F]ederal and state policies . . . indisputably mandate that, in all but the most extreme cases, children should be maintained and supported by their parents. [B]oth state and national policy has been, and continues to be, to ensure

[11] We note that this court has determined that, in some circumstances, the interest in protecting innocent third party children is not sufficient to outweigh a parent's interest in refusing unwanted medical treatment. See *Stamford Hospital* v. *Vega*, supra, 236 Conn. 663–64 ("whether [the patient's] child grows up with one, rather than two, parents or, for that matter, with no parent at all, was simply not an issue sufficiently within the scope of the hospital's legitimate interest"). Because the defendant has not challenged the relevancy of this factor in the present case, or contested the fact that the department has an interest in protecting innocent third parties, generally, we need only address whether the evidence presented was sufficient to establish that the department had a legitimate interest in protecting the defendant's minor children given the facts of the present case.

that all parents support their children and that children who do not live with their parents benefit from adequate and enforceable orders of child support." (Internal quotation marks omitted.) *In re Bruce R.*, 234 Conn. 194, 209, 662 A.2d 107 (1995). Therefore, it was not an abuse of discretion for the trial court to rest its decision regarding this factor on the possibility that the defendant could be held responsible for child support upon his release.

Accordingly, we conclude that the undisputed evidence that the defendant has minor children is sufficient to implicate the state's interest in protecting innocent third parties. Although this interest is not controlling, it was appropriate for the trial court to weigh it in the balance, and to do so in favor of allowing the commissioner to provide life sustaining nutrition to the defendant. See *Polk County Sheriff* v. *District Court*, supra, 594 N.W.2d 428.

D

Finally, with regard to the commissioner's interest in preserving security and order within the prison system, the defendant claims that, because there has not yet been a death as a result of an inmate's hunger strike in Connecticut, the commissioner's evidence as to this factor was based on mere conjecture regarding the possible effects of the defendant's continued hunger strike. The trial court's reliance on such speculation, the defendant claims, was an abuse of discretion. We disagree with the defendant's view of the record.

The commissioner presented an abundance of evidence regarding the likely deleterious effect on safety, security and the orderly administration of the prison should the defendant be allowed to starve himself to death. For example, Murphy, the deputy director, and Ducate, the director of psychiatric services, both testified that the department does not allow inmates to

engage in behavioral protests because such protests both interfere significantly with safety and security within the facility, and would encourage inmates to ignore the proper grievance procedures. They also testified that the death of an inmate, particularly a successful suicide, evokes a strong reaction from the other inmates and creates a serious safety and security concern because the other inmates may believe that the department staff contributed to, or did not do enough to prevent the inmate's death. Indeed, courts have recognized that, "[i]f prisoners were allowed to kill themselves, prisons would find it even more difficult than they do to maintain discipline, because of the effect of a suicide in agitating the other prisoners." *Freeman* v. *Berge*, supra, 441 F.3d 547; accord *McNabb* v. *Dept. of Corrections*, supra, 163 Wash. 2d 408 ("an inmate's slow death by starvation would have an unpredictable and deleterious effect on both prison staff and the prison population").

Furthermore, Murphy and Ducate testified that, not only has one inmate already sought to copy the defendant's hunger striking behavior to draw attention to his own grievance, but there is also a very high likelihood that other inmates would copy the defendant's actions if the commissioner was not allowed to intervene and the defendant was allowed to die. Murphy and Ducate testified that preventing the commissioner from intervening in the defendant's case would present others potentially committed to ending their own lives an avenue through which to make such an attempt.

Finally, Murphy and Ducate testified to the adverse impact the defendant's hunger strike has had on the department's health care resources, which would continue, and perhaps worsen, should the defendant be allowed to die. Murphy testified that the defendant's hunger strike taxes the department's health care resources because he requires ongoing monitoring and

is housed in a medical setting rather than with the general population of the prison. Ducate further indicated that the defendant's self-imposed death would be very likely to have an adverse effect on staff morale, and that lower morale would in turn increase absenteeism, which would affect the department's ability to provide care and security.

The defendant nonetheless argues that, because the commissioner's evidence does not indicate with absolute certainty what will occur within the prison system should he be allowed to carry out his hunger strike to its inevitable conclusion, the trial court's finding of a probable negative impact on safety, security and order was based on speculation and conjecture and, therefore, was an abuse of discretion. We disagree. Both Murphy and Ducate, in testifying as to the likely effects of the defendant's self-imposed death, should the department allow it, relied on their many years of experience in working within prison systems and in observing the behavior and reactions of the inmates committed to their care and custody, including inmates' reactions to suicides that actually had occurred in the past. Although the defendant's expert, Daniel B. Vasquez, a consultant on correctional issues, testified that he did not believe that allowing the defendant to die as a result of his hunger strike would encourage or lead to "copycat" hunger strikes, he did not refute the other safety related testimony presented by the commissioner. In fact, Vasquez agreed that hunger striking inmates require additional resources from department staff, that inmates expect the department to take action when an inmate is engaging in self harming behavior, and that it is unacceptable to allow an inmate to cause his own death.

Finally, we note that the judgment of the department officials in the context of assessing the seriousness of a threat to institutional security inherently "turns

largely on purely subjective evaluations and on predictions of future behavior . . . . Indeed, the administrators must predict not just one inmate's future actions . . . but those of the entire population." (Citation omitted; internal quotation marks omitted.) *Hewitt* v. *Helms*, 459 U.S. 460, 474, 103 S. Ct. 864, 74 L. Ed. 2d 675 (1983), overruled on other grounds by *Buckhannon Board & Care Home, Inc.* v. *West Virginia Dept. of Health & Human Resources*, 532 U.S. 598, 121 S. Ct. 1835, 149 L. Ed. 2d 855 (2001). Accordingly, the trial court, in its role as fact finder, was free to, and did in fact, credit the professional judgment of the department officials charged with maintaining the safety, security and order within the prison system in determining whether the defendant's conduct posed an unacceptable risk.

We therefore conclude that the trial court did not abuse its discretion in determining that the defendant's hunger strike—and its inevitable conclusion should it be allowed to continue—presented an unacceptable risk to the safety, security and orderly administration of the prison system such that this factor weighs in favor of allowing the commissioner to intervene to prevent the defendant's death.

In sum, we underscore that, although the defendant argues that the trial court incorrectly determined that the commissioner's interests outweigh his right to bodily integrity, he does not argue that, if the trial court properly concluded that the commissioner had successfully established its interests in protecting life, preventing suicide, protecting innocent third parties and maintaining prison order and security, the trial court abused its discretion in determining that those established interests do, in fact, collectively outweigh the defendant's common-law right to bodily integrity. Essentially, the defendant's argument is based on attacking each of the department's stated interests, in isolation, as unsupported by sufficient evidence or as

individually insufficient to outweigh his right to bodily integrity. As our foregoing analysis makes clear, however, these challenges lack merit. Therefore, in light of our determination that the trial court did not abuse its discretion in determining that the commissioner had established interests in: (1) preserving the defendant's life; (2) preventing the defendant's suicide; (3) protecting the defendant's children as innocent third parties; and (4) maintaining safety, security and order within the prison system, and that the defendant does not claim that the trial court improperly balanced these collective, established interests against his right to bodily integrity, we cannot conclude that the trial court abused its discretion in determining that the commissioner's interests outweigh the defendant's common-law right to bodily integrity.

## II

The defendant's second claim rests on the argument that the forcible administration of artificial nutrition and hydration violates his first amendment right to free speech and his fourteenth amendment privacy or liberty interests in being free from unwanted medical treatment under the United States constitution.[12] The commissioner contends that the trial court appropriately balanced the state's interests against the defendant's constitutional rights in determining that force-feeding the defendant, when it becomes medically necessary,

---

[12] In his appellate brief, the defendant limited his analysis to the federal constitution. At oral argument before this court, however, the defendant stated that this court may construe state constitutional rights more broadly than their federal constitution counterparts. We decline to consider a claim raised for the first time at oral argument; see *Alexandre* v. *Commissioner of Revenue Services*, 300 Conn. 566, 586 n.17, 22 A.3d 518 (2011); and we similarly decline to consider a claim that the Connecticut constitution provides greater rights than does the United States constitution where such claims have not been separately briefed. See, e.g., *State* v. *Higgins*, 265 Conn. 35, 39 n.9, 826 A.2d 1126 (2003).

does not violate his constitutional rights. We agree with the commissioner.

It is undisputed that the defendant possesses rights grounded in the first and fourteenth amendments to the United States constitution. "[W]hether [an individual's] constitutional rights have been violated must be determined by balancing his . . . interests against the relevant state interests." (Internal quotation marks omitted.) *Cruzan* v. *Director, Missouri Dept. of Health*, supra, 497 U.S. 279; see also *Roque* v. *Warden*, supra, 181 Conn. 96–97. In considering whether force-feeding the defendant to prevent irreversible damage to his health, or his death, impinges on his constitutional rights, the trial court applied the four part test set forth by the United States Supreme Court in *Turner* v. *Safley*, 482 U.S. 78, 89, 107 S. Ct. 2254, 96 L. Ed. 2d 64 (1987), under which the ultimate question is whether the prison action is "reasonably related to legitimate penological interests." Under that test, the court must evaluate: (1) whether there is "a 'valid, rational connection' between the prison regulation and the legitimate governmental interest put forward to justify it"; id.; (2) "whether there are alternative means of exercising the right that remain open to prison inmates"; id., 90; (3) "the impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally"; id.; and (4) whether there is an "absence of ready alternatives . . . ." Id.

Before turning to these factors, we note that, although the parties agreed in the proceedings before the trial court that the test set forth in *Turner* applies to the defendant's constitutional claims, in his brief to this court, the defendant now asserts that it is unclear whether this standard or some unspecified "heightened" standard governs. In light of this question, the defendant now contends that "consideration of the *Turner* factors alone should not be outcome determina-

tive." Other than this cursory statement, the defendant does not indicate what other factors would be relevant, and his brief is limited to an application of the four factors in *Turner*. Therefore, in addition to the fact that the defendant belatedly has raised this claim, he has failed to adequately brief it. Accordingly, although we acknowledge that whether the test in *Turner* applies when evaluating the validity of a particular prison action, rather than the facial validity of a prison regulation, as was the case in *Turner*, is the subject of some debate among jurists, we analyze the defendant's claim consistent with his theory at the trial court and in his brief.[13] See *State* v. *Erickson*, 297 Conn. 164, 171 n.7, 997 A.2d 480 (2010); see also *State* v. *Bruno*, 293 Conn. 127, 143 n.13, 975 A.2d 1253 (2009) ("[b]ecause the law on this issue is unsettled, and the defendant's claim is inadequately briefed, we decline to review it"). Accordingly, for the reasons set forth hereinafter, we conclude that the trial court appropriately determined that the commissioner's action in seeking an injunction to force-

---

[13] Some courts specifically have considered this question and have determined that *Turner* also governs unwritten prison policies and other prison actions. See, e.g., *Jones* v. *Salt Lake County*, 503 F.3d 1147, 1158 n.13 (10th Cir. 2007) (unwritten prison policy); *Frazier* v. *Dubois*, 922 F.2d 560, 562 (10th Cir. 1990) (transfer order of individual inmate). Others have applied the test in *Turner* in situations similar to the present case, apparently assuming without discussion the applicability of the test in "as applied" challenges. See, e.g., *In re Soliman*, 134 F. Sup. 2d 1238, 1253 (N.D. Ala. 2001) (applying *Turner* in evaluating whether force-feeding violated hunger striking prisoner's first amendment rights), appeal dismissed, *Soliman* v. *United States ex rel. Immigration & Naturalization Service*, 296 F.3d 1237 (11th Cir. 2002). Some courts, however, have held that *Turner* applies only when evaluating whether a prison regulation is facially valid, and does not apply when evaluating a challenge to the constitutionality of a prison policy as applied to a specific prisoner. See, e.g., *Stouffer* v. *Reid*, 413 Md. 491, 512, 993 A.2d 104 (2010); *McNabb* v. *Dept. of Corrections*, supra, 163 Wash. 2d 405; *Dept. of Corrections* v. *Saenz*, 299 Wis. 2d 486, 498, 728 N.W.2d 765 (2007). In this latter group of cases, the courts have balanced the prisoner's rights against the state's interest in maintaining security and orderly administration of its prison system, requiring the state to demonstrate that such interest is compelling.

feed the defendant was reasonably related to legitimate penological interests sufficient to satisfy *Turner*, and that the permanent injunction does not violate the defendant's constitutional rights.[14]

To begin, we observe that two of the factors in *Turner*, whether there is "a 'valid, rational connection' between the prison regulation and the legitimate governmental interest put forward to justify it"; *Turner* v. *Safley*, supra, 482 U.S. 89; and the "impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally"; id., 90; essentially have been disposed of in light of our analysis in part I of this opinion. As we discussed in part I D of this opinion, the commissioner established a valid, rational connection between the force-feeding of the defendant and the legitimate governmental interest of maintaining safety, security and the orderly administration of the prison system, and that, if the defendant were allowed to starve himself to death, it likely would have a negative impact on the staff, the other inmates and prison resources generally. See id., 89–90. Although the defendant argues that allowing him to proceed with his hunger strike, without intervention, would reduce the impact of his ongoing care on the department's resources, this argument fails to acknowledge the adverse impact his resulting death would have on those resources. Department officials did testify regarding the costs associated with monitoring the defendant's health due to the physical and mental effects of his ongoing hunger strike, but these are not the only costs associated with the defendant's purported exercise of his rights. The department presented evidence that an inmate death, particularly by means of suicide, increases both the demand

---

[14] The test set forth in *Turner* applies to the defendant's claims under both the first and fourteenth amendment to the United States constitution. Accordingly, we address these claims together.

for supportive services for the inmates and the prison staff, as well as the likelihood that other inmates will cause disturbances requiring more staff attention. See part I D of this opinion. The trial court, therefore, appropriately considered the costs of addressing the repercussions of the inevitable culmination of the defendant's hunger strike, should he be allowed to continue without interference.

The goal of preventing the defendant's death by way of his hunger strike in order to maintain safety, security and order is not arbitrary or irrational. Additionally, it was proper to defer to the judgment of the department officials in order to prevent the likely disturbance—and the costs associated with such disturbance—his death would cause within the prison. See *Turner* v. *Safley*, supra, 482 U.S. 90. Accordingly, we conclude that the commissioner has sufficiently satisfied the first and third factors of the test in *Turner*. See id., 89–90.

The commissioner has also presented sufficient evidence to establish that alternative means of exercising the defendant's rights remain open to him to satisfy the second factor of *Turner*.[15] See id., 90. First, the

[15] Regarding the defendant's fourteenth amendment claim that it was improper for the trial court to determine that he had a sufficient alternative to the invasion of his privacy right in the choice to consume sustaining fluids, we note that the factor analysis in *Turner* concerning "alternative means of expression" proves difficult as it relates to "passive" rights, such as the right to be free from unwanted medical treatment. In fact, other courts have noted that analysis of this factor is, rather, more appropriate within the context of first amendment rights, which allow for a spectrum of expression. See, e.g., *Washington* v. *Harper*, 494 U.S. 210, 224, 110 S. Ct. 1028, 108 L. Ed. 2d 178 (1990) (second *Turner* factor is irrelevant to fourteenth amendment challenge to administration of unwanted antipsychotic drugs); *Harris* v. *Thigpen*, 941 F.2d 1495, 1517 (11th Cir. 1991) (application of second *Turner* factor to inmate's privacy right in medical records is "problematic" because "[i]t is difficult to talk of 'alternative means' of protecting such a right, since, unlike the first amendment context, there is no range or continuum of other affirmative activity against which to measure encroachment of a given prison restriction"); *Michenfelder* v. *Sumner*, 860 F.2d 328, 331 n.1 (9th Cir. 1988) ("the second *Turner* factor . . . is much more meaningful in the first amendment context than the fourth or eighth, where the right is to be free from a particular wrong").

defendant testified that he has corresponded with friends and family members to discuss what he perceives as his unjust treatment within the Connecticut criminal justice system and to ask them to disseminate his story to national media outlets. The defendant also testified that family and friends have set up various

To the extent that we can coherently apply this factor to the defendant's fourteenth amendment claim, given the facts of this case, however, we see no reason to treat the analysis of a fourteenth amendment challenge differently than a first amendment challenge. As with his first amendment right, the alternative available to the defendant need not be one that the defendant perceives as the most desirable or the most effective means of exercising his rights. See *Overton* v. *Bazzetta*, 539 U.S. 126, 135, 123 S. Ct. 2162, 156 L. Ed. 2d 162 (2003) ("[a]lternatives . . . need not be ideal . . . they need only be available"). It is, therefore, sufficient that the defendant has an option that affords him the opportunity to avoid the intrusion upon his rights; cf. *Jordan* v. *Gardner*, 986 F.2d 1521, 1536 (9th Cir. 1993) (Reinhardt, J., concurring) (noting that policy of suspicionless cross-gender inmate searches failed to satisfy second factor of *Turner* because female inmates could do nothing to avoid being searched by male guards, and "[e]ven an inmate who stays in her cell and behaves impeccably can be forced to submit to a male guard's search of her body in an offensive, invasive, and intimate way"). In the present case, department officials not only waited until it was medically necessary to administer artificial hydration or nutrition to prevent irreversible harm or death, but also met with the defendant on numerous occasions in an attempt to seek ways through which they could convince him to consume voluntarily at least minimal sustenance. Blanchette also testified that, immediately prior to administering the nasogastric tube, and at various points during the procedure, he gave the defendant the opportunity to accept voluntarily some fluids instead of using the nasogastric tube.

This is not a situation in which department officials decided to pursue force-feeding regardless of any future action taken by the defendant that might obviate the need for such treatment. Indeed, Blanchette testified that he saw no need to pursue force-feeding or forced intravenous hydration if the defendant was going to be compliant. Therefore, it is clear that, had the defendant opted to consume voluntarily at least a minimal amount of fluids to reduce the risk that his health was in imminent danger, department officials would not have proceeded with the forced intravenous hydration or the nasogastric procedure. Accordingly, to the extent that this factor applies to the defendant's fourteenth amendment claim, the trial court appropriately determined that the defendant had the alternative option of consuming sustaining fluids sufficient to preserve his life and health, and continuing his protest simply by means of refusing solid nutrition.

publicly available websites providing information about the defendant and the reasons for his hunger strike, and that his attorneys had issued several press releases on his behalf. Furthermore, the defendant has pursued, although unsuccessfully, the various judicial avenues through which an inmate may contest the validity of his conviction and prison sentence, appealing his conviction and petitioning for habeas corpus relief.

The defendant contends that the evidence presented demonstrates that the alternative means of expression sufficient to satisfy his first amendment rights are, in fact, unavailable to him. This is because he has no further judicial avenues through which to challenge his conviction and incarceration. In addition, he argues that he did not draw media attention until four months after his protest began, and that the trial court improperly considered the existence of a website advancing his claims. As the commissioner pointed out, however, the defendant has not cited, nor has this court's research revealed, any case law requiring that alternative means of expression successfully effect change in order for such avenues to satisfy first amendment rights. Rather, it is sufficient that the defendant had the opportunity to contest the validity of his conviction and continued incarceration via his appeal and his habeas corpus petition, and that he has had the opportunity to correspond with friends and family to discuss his perceived plight and to request that they set up websites on his behalf with the aim of drawing media attention, if that is his wish. See *Overton* v. *Bazzetta*, 539 U.S. 126, 135, 123 S. Ct. 2162, 156 L. Ed. 2d 162 (2003) ("[a]lternatives . . . need not be ideal . . . they need only be available"). Thus, it is clear that the defendant not only has access to, but also has utilized, numerous alternative means of first amendment expression. Accordingly, we conclude that the trial court appropriately determined that the second factor in *Turner* was satisfied.

Finally, the commissioner sufficiently established the absence of ready alternatives to the forced administration of fluids and nutrition, thus supporting the reasonableness of the action. *Turner* v. *Safley*, supra, 482 U.S. 90. It is not disputed that, although there are myriad means of providing sustaining nutrients and hydration for someone who refuses to, or cannot voluntarily consume food, the nasogastric procedure carries the fewest risks, and is the easiest to perform. This court need not evaluate the potential appeal of every possible procedure available to maintain the life and health of the defendant while he persists in his hunger strike. "This is not a 'least restrictive alternative' test: prison officials do not have to set up and then shoot down every conceivable alternative method of accommodating the [inmate's] constitutional complaint. . . . But if an inmate . . . can point to an alternative that fully accommodates the prisoner's rights at de minimus cost to valid penological interest, a court may consider that as evidence that the regulation does not satisfy the reasonable relationship standard." (Citation omitted.) Id., 90–91.

Nor are we willing to dictate a course of medical treatment in contravention to the professional decisions made by the physicians involved with the defendant's care on an ongoing basis. Although the defendant points to possible alternative medical procedures through which nutrition may be administered, he, undoubtedly, would still believe that such procedures violate his rights to engage in his hunger strike as a means of exercising his freedom of speech and to refuse a perceived invasion of his privacy or liberty through unwanted medical treatment. Thus, we agree with the commissioner that the only alternatives are either to intervene to prevent the defendant's death or to refrain from intervening and allow the defendant to starve himself to death and accept the resulting disturbance to

the safety, security and order to the prison system. Accordingly, we conclude that there is an absence of ready alternatives to the intervention into the defendant's hunger strike to prevent his death, and that the fourth factor in *Turner* is satisfied in the present case.

In sum, the commissioner has established, with sufficient certainty, that force-feeding the defendant when it becomes medically necessary to avert permanent damage or death is rationally related to legitimate penological interests. We therefore conclude that the permanent injunction allowing the commissioner to force-feed the defendant in order to sustain his life and health did not violate the defendant's constitutional rights.

### III

Finally, the defendant claims that the trial court improperly determined that international law does not prohibit force-feeding him. The defendant and the amici curiae argue that the weight of international authority condemns force-feeding inmates—even when necessary to prevent death or permanent damage—as medically unethical. In response, the commissioner maintains that international law is not binding on this court, and the body of law presented by the defendant and the amici curiae do not represent a consensus of international opinion on this issue. We agree with the commissioner.

Initially, we note that other courts have determined that international law is not binding on the courts of the United States unless it has reached the status of customary international law, meaning that it reflects a wide acceptance among the states and it appears that the states follow the practice from a sense of legal obligation. See *Flores* v. *Southern Peru Copper Corp.*, 414 F.3d 233, 248 (2d Cir. 2003), citing *Chubb & Son, Inc.* v. *Asiana Airlines*, 214 F.3d 301, 307–308 (2d Cir. 2000), cert. denied, 533 U.S. 928, 121 S. Ct. 2549, 150

L. Ed. 2d 716 (2001), *Kadic* v. *Karadzic*, 70 F.3d 232, 239 (2d Cir. 1995), cert. denied, 518 U.S. 1005, 116 S. Ct. 2524, 135 L. Ed. 2d 1048 (1996), and *Filartiga* v. *Pena-Irala*, 630 F.2d 876, 888 (2d Cir. 1980); see also 1 Restatement (Third), Foreign Relations Law of the United States § 102 (2), pp. 30–32 (1987). Furthermore, "customary international law is a diffuse and often highly uncertain body of norms whose force and enforceability vary greatly even in the international sphere; and its status in our domestic courts is even more qualified." *Igartua-De la Rosa* v. *United States*, 417 F.3d 145, 151 (1st Cir. 2005), citing *Sosa* v. *Alvarez-Machain*, 542 U.S. 692, 124 S. Ct. 2739, 159 L. Ed. 2d 718 (2004). Even if international law has not reached the level of universal acceptance, however, United States courts have looked to sources of international law to inform interpretations of certain state and federal constitutional rights. See, e.g., *Graham* v. *Florida*, 560 U.S. 48, 80, 130 S. Ct. 2011, 176 L. Ed. 2d 825 (2010) (international law used to support interpretation of meaning of "cruel and unusual" under eighth amendment); *Roper* v. *Simmons*, 543 U.S. 551, 575, 125 S. Ct. 1183, 161 L. Ed. 2d 1 (2005) (same). Nevertheless, given our conclusion, set forth fully hereinafter, that there is no international consensus prohibiting force-feeding prison inmates when it becomes medically necessary, which might prohibit us from allowing the commissioner to force-feed the defendant in the present case, we need not address the relative merits or persuasiveness of policy justifications presented by those countries that prohibit force-feeding competent inmates in all circumstances, or whether international law is relevant at all.

The defendant and the amici argue that the weight of international authority suggests that force-feeding a competent inmate amounts to a violation of international human rights, and thus may not be condoned by this court. In support of their contention that interna-

tional law establishes a per se ban on force-feeding a competent inmate who has voluntarily embarked on a hunger strike, the defendant and the amici cite to the "Declaration of Tokyo—Guidelines for Physicians Concerning Torture and other Cruel, Inhuman or Degrading Treatment or Punishment in Relation to Detention and Imprisonment" (Declaration of Tokyo), and the "Declaration of Malta on Hunger Strikers" (Declaration of Malta), promulgated by the World Medical Association, which prohibit force-feeding competent prisoners who have refused nourishment.[16] According to its own handbook, the voice of the World Medical Association is "authoritative, being the considered opinion of many medical experts from every region of the world," and the World Medical Association declarations "have carried great weight in national and international debates."

[16] Declaration six of the "Declaration of Tokyo" provides: "Where a prisoner refuses nourishment and is considered by the physician as capable of forming an unimpaired and rational judgment concerning the consequences of such a voluntary refusal of nourishment, he or she shall not be fed artificially. The decision as to the capacity of the prisoner to form such a judgment should be confirmed by at least one other independent physician. The consequences of the refusal of nourishment shall be explained by the physician to the prisoner." World Medical Association, "Declaration of Tokyo—Guidelines for Physicians Concerning Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment in Relation to Detention and Imprisonment," (Rev. 2006), available at http://www.wma.net/en/30pub lications/10policies/c18/index.html (last visited February 28, 2012) (copy contained in the file of this case in Supreme Court clerk's office). Guideline eleven of the "Guidelines for the Management of Hunger Strikers," as set forth in the "Declaration of Malta," provides in relevant part: "It is ethical to allow a determined hunger striker to die in dignity rather than submit that person to repeated interventions against his or her will." World Medical Association, "Declaration of Malta on Hunger Strikers," (Rev. 2006), available at http://www.wma.net/en/30publications/10policies/h31/index.html (last visited February 28, 2012) (copy contained in the file of this case in Supreme Court clerk's office). Guideline thirteen of the "Guidelines for the Management of Hunger Strikers," as set forth in the "Declaration of Malta" provides in relevant part: "Forcible feeding is never ethically acceptable. Even if intended to benefit, feeding accompanied by threats, coercion, force or use of physical restraints is a form of inhuman and degrading treatment. . . ." Id.

World Medical Association, "Handbook of Declarations," available at http://www.wma.net/en/30publica
tions/10policies/10about/index.html (last visited February 28, 2012) (copy contained in the record of this case in Supreme Court clerk's office). The World Medical Association nonetheless concedes that it has no actual powers, nor does it seek to have any actual powers in relation to lawmaking, and only hopes to "provide useful guidance to doctors when the right course of action is in doubt." Id.

The defendant and the amici also cite to a handful of domestic opinions in which judges have relied on the "Declaration of Tokyo" and the "Declaration of Malta" in support of a conclusion that the government's interest in maintaining the ethical integrity of the medical profession does not weigh in favor of force-feeding hunger striking inmates. See *Hill* v. *Dept. of Corrections*, supra, 922 A.2d 941–42 (McCullough, J., concurring) ("Declaration of Tokyo" and "Declaration of Malta" offer insight into ethical concerns of medical profession in dealing with hunger striker); *In re Lilly*, Case No. 07CV392 (Wis. Cir. May 19, 2009) (state's interest in safeguarding medical integrity under "Declaration of Malta" proscribes forcible feeding of inmate patients), rev'd, 337 Wis. 2d 185, 804 N.W.2d 489 (2011); *McNabb* v. *Dept. of Corrections*, supra, 163 Wash. 2d 425 (Sanders, J., dissenting) ("Declaration of Malta" indicates government interest in maintaining medical ethics did not weigh in favor of force-feeding). The defendant and the amici argue that these opinions demonstrate a consensus against force-feeding as expressed by the World Medical Association declarations. This statement misses the mark, however, because it fails to acknowledge that the opinions cited—a concurring opinion, a dissenting opinion and an unreported trial court opinion that was later reversed by the Wisconsin Court of Appeals—not only fail to carry the precedential

weight of a majority opinion, but also reveal an absence of consensus concerning how United States courts view the import of the "Declaration of Tokyo" and the "Declaration of Malta."

In addition, although the defendant and the amici have pointed to some countries that, as a rule, do not allow force-feeding competent inmates who voluntarily refuse to accept nutrition or hydration; see Correctional Service of Canada, Corrections and Conditional Release Act, S.C. 1992, c. 20, § 89, available at http://laws-lois.jus tice.gc.ca/PDF/C-44.6.pdf (last visited February 28, 2012) (copy contained in the file of this case in the Supreme Court clerk's office) ("[t]he [correctional service] shall not direct the force-feeding, by any method, of an inmate who had the capacity to understand the consequences of fasting at the time the inmate made the decision to fast"); cf. *Secretary of State for the Home Dept.* v. *Robb,* [1995] Fam. 127, 131–32, [1995] 2 W.L.R. 722 (in United Kingdom, right to self-determination is not absolute, but state must establish countervailing interest to outweigh prisoner's right to refuse food); there appear to be a number of other nations that specifically allow for the force-feeding of inmates in some instances. See also Council of Europe, "Report on the Organisation of Health Care Services in Prisons in European Member States," § 4.6 (1998), available at http://www.coe.int/t/dg3/health/Prisonsreport_en.asp (last visited February 28, 2012) (copy contained in the file of this case in the Supreme Court clerk's office).[17]

Furthermore, the amici acknowledge that the European Court of Human Rights (European Court) has not

---

[17] The Council of Europe's report indicates that Finland follows the World Medical Association's "Declaration of Tokyo," Spain and Sweden allow involuntary feeding if there is immediate danger to the life or health of the hunger striker, and Italy prohibits involuntary feeding unless the hunger striker is no longer aware of the consequences of continued food refusal. Council of Europe, supra, § 4.6.

barred force-feeding in all contexts. Indeed, as the trial court in the present case noted, it appears that the European Court specifically permits the force-feeding of inmates when such measures are medically necessary to prevent death or permanent damage and the measures used are not severe. In *Ciorap* v. *Moldova*, App. 12066/02, Eur. Ct. H.R. para. 77 (2007), the European Court stated that "a measure which is of therapeutic necessity from the point of view of established principles of medicine cannot in principle be regarded as inhuman and degrading . . . . The same can be said about force-feeding that is aimed at saving the life of a particular detainee who consciously refuses to take food." (Citation omitted.) The court further noted that medical necessity must be "convincingly shown to exist" and that the "manner in which the applicant is subjected to force-feeding during the hunger-strike must not trespass the threshold of the minimum level of severity envisaged by the [c]ourt's case law under [a]rticle [two] of the [c]onvention." Id.;[18] see also *Herczegfalvy* v. *Austria*, App. 10533/83, Eur. Ct. H.R. paras. 83 and 84 (September 24, 1992) (when force-feeding and restraints are medically necessary, no violation of article three of convention). Thus, it appears that the European Court has determined that force-feeding hunger striking inmates not only is allowed when medically necessary and performed with a minimum level of severity, but also that such a procedure is specifically not, as the defendant contends, inhuman or degrading. Therefore, it appears that there is no international consensus regarding whether states may force-feed inmates, and as a result, states may make individual determinations regarding whether, and under what set

---

[18] The European Court ultimately decided that force-feeding an inmate amounted to torture, in violation of article three of the convention, because the government did not demonstrate a medical necessity for force-feeding him, and the manner in which it was carried out was unnecessarily painful and humiliating. *Ciorap* v. *Moldova*, supra, App. 12066/02, para. 89.

of circumstances, to allow the force-feeding of prison inmates.

If this case involved a question regarding the propriety of the methods used, or the motivation for force-feeding the defendant, it is possible that international law proscribing force-feeding as a means of punishment—such as when it is intended to humiliate or is carried out with excess force—would, perhaps, carry more weight. We are not, however, dealing with a case wherein the department used unreasonable or unnecessary force or performed the nasogastric procedure in such a way that it exceeded a minimum level of severity. Nor are we dealing with a case wherein the department officials were motivated by any objective other than preserving the defendant's health in the face of imminent permanent damage or death. In fact, the record clearly indicates that force-feeding the defendant was a last resort considered only when the health care professionals believed the risk to the defendant's health by his continued refusal to ingest fluids and nutrition—despite their best efforts to convince the defendant to voluntarily accept at least a minimal amount of fluids or nutrition—became unacceptable. Furthermore, the record is replete with evidence that the nasogastric procedure is both the least complicated and least risky means of providing artificial nutrition.

It is clear that the commissioner appropriately sought to preserve the defendant's life using the safest, simplest procedure available, rather than improperly seeking to punish the defendant for engaging in his hunger strike. We therefore conclude that the trial court properly determined that the weight of international authority does not prohibit medically necessary force-feeding under such circumstances.

The judgment is affirmed.

In this opinion the other justices concurred.